1  SCHIFF HARDIN LLP
   ROBERT B. MULLEN (CSB #136346)
2  YAKOV P. WIEGMANN (CSB #245783)
   One Market, Spear Street Tower, 32nd Floor
3  San Francisco, CA 94105
   Telephone:   (415) 901-8700
4  Facsimile:   (415) 901-8701

5  Attorneys for Defendant
   M.P. TECHNOLOGIES, INC.
6
   MOSLEY & GEARINGER LLP
7  Mark L. Mosley (CSB #136449)
   Brian Gearinger (CSB #146125)
8  825 Van Ness Ave., 4th Floor
   San Francisco, CA  94109
9  Telephone:   (415) 440-3175
   Facsimile:   (415) 440-3103
10
   Attorneys for Defendants and Counterclaimants
11 MASUO YOSHIMOTO and M2M, INC.

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14

15 ROBERT R. CREAGER, an individual,          Case No.:  C 05-01985 JSW

16             Plaintiff,                      **DEFENDANTS' BRIEF IN SUPPORT OF
                                               MOTION FOR SUMMARY JUDGMENT**
17        v.
                                               Date:       August 3, 2007
18 MASUO YOSHIMOTO, an individual; M.P.        Time:       9:00 a.m.
   TECHNOLOGIES, INC., a corporation;          Place:      Courtroom 2, 17th Floor
19 and M2M, INC., a corporation,
                                               Trial Date: November 5, 2007
20             Defendants.

21 MASUO YOSHIMOTO, an individual and
   M2M, INC., a corporation,
22
               Counterclaimants,
23
          v.
24
   ROBERT R. CREAGER, an individual,
25
               Counterdefendant.
26

27

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

09798.00002
657887.1

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Case No.:  C 05-01985 JSW

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................. 1

II.   STATEMENT OF FACTS ................................................................ 1

    A.   The MOU ................................................................................. 1

    B.   Creager's Bad Acts While Operating AMG ................................ 5

III.   ARGUMENT .................................................................................... 6

    A.   The Undisputed Facts Defeat The First
        Cause of Action For Breach of Contract. ................................. 6

        1.   Creager did not enter any agreement with MPT. ............. 6

        2.   The conduct of the parties establishes without
            dispute the equity compensation proposed in
            paragraph 10 of the MOU never became a contract. ...... 9

            a.   Creager is an attorney............................................ 9

            b.   A formal employment agreement was
               drafted but not entered.......................................... 10

            c.   A rich e-mail record confirms that Creager's
               proposal to receive equity compensation
               never became contractual. ..................................... 11

            d.   Creager never even asked Yoshimoto
               to pay him equity compensation under the MOU. .............. 14

        3.   Creager has waived any rights he had
            to enforce the MOU........................................................ 15

    B.   Creager's Second Cause of Action for Breach
        of Covenant of Good Faith and Fair Dealing
        is Not a Separate Basis of Recovery. ....................................... 15

    C.   Creager Lacks Evidence to Support His
        Third Cause of Action for Fraud............................................... 16

        1.   Creager lacks evidence of any intention
            to mislead...................................................................... 16

        2.   The evidence establishes Creager has
            suffered no damages as a result of the alleged fraud. ................. 17

    D.   Creager's Fourth Cause of Action for Violation of
        Section 17200 of the California Business &
        Professions Code Fails as a Matter of Law. ............................. 18

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-i-

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Case No.:  C 05-01985 JSW

1.   The "unlawful" prong of the UCL applies
only to violations of statutes and court orders. .............................. 19

2.   The "unfair" prong of the UCL requires a
claim to be defined by a legislatively declared policy. ................... 19

3.   The "fraudulent" prong of the UCL does not
apply to practices that are not likely to deceive
members of the public. ................................................................ 20

4.   Creager's UCL claim also fails because he
seeks compensatory damages, not restitution. ............................ 21

E.   Creager's Fifth Cause of Action for Unjust Enrichmen
Fails Because Unjust Enrichment is Simply Restitution. ......................... 22

F.   Creager's Unclean Hands Defeat the Equitable
Causes of Action ............................................................................... 23

G.   Creager's Sixth Cause of Action for Common Counts
Fails Because He Does Not Seek a Certain Sum of Money. .................. 24

1.   Creager's alleged damages are not specific. ............................... 24

2.   Further, common counts are improper where
the defendant's obligation is something other
than the payment of money. ........................................................ 24

3.   Moreover, Creager's common count claim must
fail if his breach of contract claim fails. ....................................... 24

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

09798.00002
657887.1

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

-ii-

Case No.: C 05-01985 JSW

# TABLE OF AUTHORITIES

## CASES

*Albillo v. Intermodal Container Services, Inc.*
    114 Cal. App. 4th 190 (2003)............................................................. 18

*AccuImage Diagnostics Corp. v. TeraRecon, Inc.*
    260 F. Supp. 2d 941 (N.D. Cal. 2003) ...................................... 19

*Beck v. American Health Group International*
    211 Cal. App. 3d 1555 (1989) ................................................... 9

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telegraph Co.*
    20 Cal.4th 163 (1999) ........................................................... 19

*Cicone v. URS Corp.*
    183 Cal. App. 3d 194 (1986) .................................................. 16

*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe and Takeout III, Ltd.*
    30 Cal. App. 4th 54 (1994) .................................................... 15

*Daugherty v. America Honda Motor Co., Inc.*
    144 Cal. App. 4th 824 (2006).................................................. 20

*Farmers Insurance Exch. v. Zerin*
    53 Cal. App. 4th 445 (1997) .................................................. 24

*Foley v. Interactive Data Corp.*
    47 Cal.3d 654 (1988) ........................................................... 16

*Freeman & Mills, Inc., v. Belcher Oil Co.*
    11 Cal.4th 85 (1995) ........................................................... 16

*Guz v. Bechtel National, Inc.*
    24 Cal.4th 317 (2000) ...................................................... 15, 16

*Hays v. Temple*
    23 Cal. App. 2d 690 (1937)................................................... 25

*In Re Firearms Cases*
    126 Cal. App. 4th 959 (2005)................................................. 19

*Gregory v. Albertson's, Inc.*
    104 Cal. App. 4th 845 (2002).................................................. 20

*Kennecott Corp. v. Union Oil Co.*
    196 Cal. App. 3d 1179 (1987)................................................... 9

- iii -

SCHIFFHARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Korea Supply Co. v. Lockheed Martin Corp.*
   29 Cal.4th 1134 (2003) ......................................................................... 21, 22

*Kraus v. Trinity Management Services, Inc.*
   23 Cal.4th 116 (2000) ............................................................................... 21

*McBride v. Boughton*
   123 Cal. App. 4th 379 (2004) ............................................................... 22, 24

*McKell v. Washington Mutual, Inc.*
   142 Cal. App. 4th 1457 (2006) ................................................................. 22

*Melchior v. New Line Products, Inc.*
   106 Cal. App. 4th 779 (2003) ................................................................... 22

*National Rural Telecomm. Cooperative v. DIRECTV, Inc.*
   319 F. Supp. 2d 1059 (C.D. Cal. 2003) ............................................... passim

*Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*
   324 U.S. 806 (1945) ................................................................................. 23

*O'Connor v. Dingley*
   26 Cal. 11 (1864) .................................................................................... 24

*Schnall v. Hertz Corp.*
   78 Cal. App. 4th 1144 (2000) ............................................................... 19, 20

*Smith v. S.F.*
   225 Cal. App. 3d 38 (1990) ..................................................................... 16

*Wagner v. U.S.*
   71 Fed. Cl. 355 (Fed. Cl. 2006) ................................................................. 8

*Watson Laboratoriess, Inc. v. Rhone-Poulenc Rorer, Inc.*
   178 F. Supp. 2d 1099 (C.D. Cal. 2001) ................................................. 20, 21

*Wilson v. S. L. Rey, Inc.*
   17 Cal. App. 4th 234 (1993) ..................................................................... 23

*Wilhelm v. Pray, Price, Williams & Russell , 186*
   Cal. App. 3d 1324 (1986) ......................................................................... 16

*Woodbine v. Van Horn*
   29 Cal.2d 95 (1946) ................................................................................... 9

SCHIFFHARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- iv -

*Younan v. Equifax, Inc.*
    111 Cal. App. 3d 498 (1980) ..................................................................................... 17

## STATUTES

Cal. Bus. & Prof. Code § 17200 ..................................................................................... 18

      Cal. Bus. & Prof. Code § 17203 ............................................................... 21, 22

Cal. Civ. Code §§ 1709-1710 ......................................................................................... 16

Cal. Civ. Code § 1936(m) ............................................................................................... 20

Cal. Civ. Code § 3343 ..................................................................................................... 17

## TREATISES

4 Witkin, Cal. Proc (4th ed. (1997) *Pleading,* § 581. ............................................... 24, 25

5 Witkin, Cal. Procedure (3d ed. 1985) *Pleading,* § 662, at 111 .................................... 16

5 Witkin, Summary of Cal. Law (9th ed. 1988) *Torts,* § 676, at 778 ............................. 16

Schwarzer, Tashima & Wagstaffe, Cal. Prac. Guide: Fed. Civ. Pro. Before Trial
    (The Rutter Group 2007) Summary Judgment
    ¶ 14:166.15 ........................................................................................................... 8

SCHIFFHARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- v -

## I.   INTRODUCTION

In this lawsuit, plaintiff Robert Creager "Creager") is asking the Court to award him millions of dollars in damages and other remedies against defendants Masuo Yoshimoto ("Yoshimoto"), M2M, Inc., Yoshimoto's personal holding company ("M2M"), and MP Technologies, Inc. ("MPT") (collectively, "Defendants").  Creager claims he sustained these damages when Defendants cut off funding for AMG, a start-up company that Creager was operating to help Yoshimoto expand MPT's business in the United States and elsewhere.  Creager's various causes of action are all predicated on Defendants' alleged breach of a "memorandum of understanding" ("MOU") that Creager entered into with Yoshimoto at a meeting in Australia in July 2004.

In this motion, Defendants present uncontroverted evidence that none of the parties considered the MOU to be a binding contract.  Indeed, Creager himself admits that MPT was never even a party to the MOU.  Thus, Creager's breach of contract claim fails as a matter of law.  Defendants also explain why each of Creager's ancillary causes of action fail along with it.

## II.   STATEMENT OF FACTS

### A.    The MOU

Creager is a graduate of Hastings College of Law, at all relevant times an active member of the California Bar.  In April 2004, Creager was unemployed and living in San Francisco when Mika Saitoh, his romantic partner, introduced him to Yoshimoto.  Deposition of Robert R. Creager ("Creager Dep.") at 12:10-11, 78:11-13 and Ex. 41, Ex. B to Declaration of Robert B. Mullen ("Mullen Dec.").  Yoshimoto is Chief Executive Officer of MPT, a publicly traded company in Japan that provides on-demand movies and broadband services to hotels.  In May 2004, Creager and Saitoh met with Yoshimoto in Tokyo, where Creager agreed to start helping Yoshimoto expand MPT's operations outside of Japan and China.  Creager Dep. at 86:12-87:5.  Creager recalls that at the conclusion of the visit, he had a "handshake agreement" for Yoshimoto to fund approximately half a million dollars to start a California company.  Creager Dep. at

SCHIFFHARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  88:11-13.

2      Creager and Yoshimoto next met in Melbourne, Australia in July 2004.  Creager

3  presented Yoshimoto with a draft of a Memorandum of Understanding ("MOU") shortly

4  after he and Yoshimoto arrived.  Creager Dep. at 99:13-16.  Yoshimoto made some

5  minor edits, and Creager revised the document and asked Yoshimoto to sign it.  Creager

6  Dep. at 112:24-113:9.  Creager knew that Yoshimoto is "a Japanese person who's not

7  totally clear in English."  Creager Dep. at 32:6-15.  Creager never suggested to

8  Yoshimoto that he should have an attorney review the MOU before he signed it, nor did

9  he tell Yoshimoto the MOU is a binding contract.  Creager Dep. at 114:13-22; Yoshimoto

10 Dep. at 170:15-20, Ex. C to Mullen Dec.  Creager and Yoshimoto never discussed the

11 MOU (Ex. A to the Complaint, Ex. A to Mullen Dec.) after they signed it on July 11, 2004.

12 Creager Dep. at 130:1-5 and 177:4-9.

13     The MOU contemplated the formation of a company named AMG, with Creager

14 as its CEO.  The MOU called for Yoshimoto's limited liability company, M2M, to provide

15 start-up funding to AMG in the amount of $500,000.  The purpose of AMG as stated in

16 the MOU was to distribute MPT software, products and services outside Japan and

17 China, and serve as an acquisition management company for MPT.

18     Creager alleges the MOU is a contract.  He acknowledges he entered the MOU

19 with Yoshimoto individually and/or M2M, not with MPT.  Yoshimoto informed Creager

20 after their Tokyo meeting that MPT would not enter an agreement of this nature.

21 Creager therefore prepared the MOU only for Yoshimoto's signature.  Creager Dep. at

22 138:3-12.  The aspect of the MOU Creager seeks to enforce in this lawsuit is found in

23 paragraph 10:

24         [A]t the closing of each acquisition by MPT managed by AMG
           (whether the direct acquiror is AMG or MPT or a related
25         entity) Robert Creager will receive 3% of the stock of the
           acquired company plus a 10-year option to purchase an
26         additional 2% at the acquisition price per share.

27 Paragraph 10 contemplated this equity compensation and other compensation would be

28 provided to Creager in an employment agreement making him CEO of AMG.  Ex. A to

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Case No.: C 05-01985 JSW

Mullen Dec.

In early August 2004, Yoshimoto transferred approximately $500,000 to an account Creager established for starting AMG. Creager had already hired the Wilson Sonsini firm to draw up an employment agreement between him and AMG. Discussed below, that agreement varied from the MOU in a significant respect concerning equity compensation. Later in the month, Creager presented the employment agreement to Yoshimoto for his signature. Creager Dep. at 140:12-22. Yoshimoto did not sign or assent to the agreement. Creager Dep. at 140:23-141:3, 144:22-23. Creager hired two employees, Ms. Saitoh (director of business development) and an engineer named Hilmi Ortadeveci (technical director). Creager paid their salaries from the start-up funds, as well as his own salary at a rate of $300,000 per year plus a starting bonus of $37,500.

As evidenced below, by late September, 2004, it became clear to Creager and Yoshimoto that AMG was never going to be "an acquisition management company for MPT," and no further discussions took place regarding any right of Creager to equity compensation in companies acquired by MPT – the 3% stock and 2% option described in paragraph 10 of the MOU. In fact, Creager never asked Yoshimoto for any portion of this equity compensation before he filed this lawsuit.[1]

By Yoshimoto's account, within several months after he funded AMG the $500,000, it became evident that Creager was an irresponsible spender and not the capable executive he had held himself out to be. Yoshimoto nevertheless strived to find a useful purpose for Creager and the two AMG employees. Much of their work in late-2004 involved Guest-Tek Interactive Entertainment Ltd. ("Guest-Tek"), a publicly traded Canadian video on-demand company. In August, 2004, Creager had proposed to

---

[1] Other proposals in the MOU also fell by the wayside. Paragraph 7 of the MOU provided : "[A]n additional cash injection of at least US$500K will be made by MPT to AMG by the end of 2004." Creager Dep. at 107:10-14 and Ex. 56. On November 17, 2004, Plaintiff wrote an email to Yoshimoto that said: "What is your idea about the next AMG financing? Would you prefer to keep all AMG financing under M2M? Or maybe it would be possible for Guest-Tek to invest in AMG? Or maybe NeoIndex or Vodaphone? We need to finalize the next AMG financing by the end of January." Creager Dep. at 190:3-10 and Ex. 67.

SCHIFFHARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

09798.00002
657887.1

-3-

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Case No.: C 05-01985 JSW

Yoshimoto that MPT acquire Guest-Tek,[2] and MPT moved forward with the acquisition. The AMG employees then primarily assisted Guest-Tek with internalizing MPT's "middleware" called MBOS. By 2005, however, AMG had little to do and Yoshimoto could not justify investing any more money into AMG. On March 2, 2005, Yoshimoto informed Creager that he would provide no further funding, effectively ending AMG.

Between January and May, 2005, MPT acquired controlling interests in three companies: Guest-Tek of Calgary; LogicLink, with an office in Irvine; and MagiNet Corporation, Creager's old company[3], now headquartered in Singapore. The amounts of the respective investments were approximately $40 million, $7.5 million and $70 million, a total of over $100 million against which Creager claims ownership of 3%, based on the proposition AMG "managed" the acquisitions. Creager and AMG did not "manage" these acquisitions in any ordinary sense of that word. Rather, Creager appears to have functioned as a facilitator, at most an advisor to Yoshimoto, and a well-compensated advisor at that. Regardless, the "manage" issue is not addressed in this motion. Instead, here we provide undisputed facts showing (1) Creager did not enter the MOU with defendant MPT; and (2) Creager and Yoshimoto never reached agreement about equity compensation to Creager relating to acquisitions by MPT, so his breach of contract claim fails as against all defendants. Further, the undisputed facts and the law support summary judgment of each of Creager's additional causes of action.

---

[2] Creager then purchased approximately 103,000 shares of Guest-Tek stock at approximately $4 per share. Creager Dep. at 247:3-5 and 256:17-257:4. When Creager purchased the shares, he knew MPT was interested in purchasing Guest-Tek. Creager Dep. at 250:17-252:15. Creager also knew that MPT's interest in purchasing Guest-Tek had not been disclosed publicly to the market. Creager Dep. at 253:7-10. Creager sold approximately one-half his Guest-Tek shares for approximately $6.50 per share in early 2005. Creager Dep. at 256:10-259:6.

[3] In the 1990s, Creager started and served as CEO of MagiNet, a Hong Kong-based hotel video company. According to MagiNet's current CEO N.Y. Lee, Creager ran MagiNet into the ground by accumulating too much debt to make the interest payments. As a result, in 2000 Lee and Kevin Lee (not related) purchased the debt of MagiNet and converted it into equity in the newly reconstituted MagiNet, becoming the majority owners. The Lees then forced Creager to resign. Dep. of N.Y. Lee at 35:23-36:6, 64:5-18 and Ex. 90, Ex. E to Mullen Dec. MagiNet is the largest company in the video-on-demand and high-speed Internet services for the hospitality industry in the Asia-Pacific region. Complaint, ¶ 18.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-4-

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Case No.: C 05-01985 JSW

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### B.   Creager's Bad Acts While Operating AMG

As set forth in Yoshimoto's counterclaims, this lawsuit concerns more than defendants' alleged breach of a pre-contract.  It appears Creager filed this lawsuit at least in part to help him collect a $1,062,750 "finder's fee" that he had secretly arranged with MagiNet while Creager was still the CEO of AMG and owed a fiduciary duty to AMG.

On December 25, 2004, Creager and N.Y. Lee discussed a possible acquisition of MagiNet by MPT.  Creager Dep. at 259:19-22, 260:1-10.  On January 14 and January 15, 2005, the two exchanged emails in which they negotiated the amount of a "finder's fee" to Creager.  Deposition of N.Y. Lee ("N.Y. Lee Dep.") at 79:11-14, 82:12-15 and Exs. 94 and 95, and Creager Dep. at 261:14-262:23.  In February 2005 at a meeting in Bangkok, Creager and Lee reached agreement on the fee: 1.5% of MPT's purchase price of MagiNet.  Creager Dep. at 265:14-266:7.  Lee Dep. at 64:5-18, 70:9-71:16 and Exs. 90 and 91.  Thus, at the very time Creager was purporting to assist MPT to consider buying a controlling interest in MagiNet and then to negotiate the purchase of MagiNet with the Lees, he was negotiating and consummating an agreement with NY Lee to be paid 1.5% of the value of the MagiNet shares purchased by MPT.  In effect, he "played both sides of the deal."  Creager never told Yoshimoto about his agreement with Lee. Creager Dep. at 266:12-17, 269:11-14.[4]

Yoshimoto discovered Creager's finder's fee deal in late April, 2005 when conducting due diligence on the MagiNet acquisition.  Furious, he asked NY Lee not to pay Creager and met with Creager on May 14, 2005 in the San Francisco Hilton.  During this meeting, Creager caused Yoshimoto to be served with the summons and complaint in this action.  Creager Dep. at 270:9-271:15.  The meeting continued into the night and

---

[4] Also unbeknownst to Yoshimoto, Creager had sued the Lees and MagiNet in June, 2002 in Santa Clara County Superior Court, alleging the Lees breached an agreement to convey to him a percentage of MagiNet's shares, pursuant to several versions of a disputed contract that accompanied his ouster from MagiNet.  In July 2004, just days after Creager and Yoshimoto signed the MOU here, the Lees agreed to pay Creager nearly $2 million in settlement.  Creager Dep. at 20:1-22:14.

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Case No.: C 05-01985 JSW

1 | ended the following day, when Creager gave Yoshimoto a ride to the San Francisco

2 | airport.  By Yoshimoto's account, Creager and Yoshimoto made an oral agreement

3 | under which Yoshimoto would approve MagiNet's payment of the $1,062,750 to

4 | Creager, and in exchange Creager would "stop" this lawsuit and invest the money in a

5 | prospective project of Yoshimoto's.  Yoshimoto kept his promise, and in May 2005, Lee

6 | paid Creager the $1,062,750.  Creager did not keep his promises.  Creager disputes he

7 | made this agreement, but he admits to sending this email on June 14, 2005:

> Although I want to help you in any way that I can, my
> attorneys have informed me that it is impossible to delay the
> lawsuit because it has already been filed.  It will take a few
> months to run its course but it cannot be stopped.

11 | Creager Dep. at 27:13-28:4 and Ex. 43.  He further admits, as he must, that he had the

12 | ability to "delay" or dismiss the lawsuit; but explains his email was merely an expression

13 | that it was "inadvisable and impractical" for him to dismiss this lawsuit, based on

14 | privileged advice from his attorneys.  Creager Dep. at 28:18-35:4.

15 |     Because Creager disputes some of these facts, defendants Yoshimoto and M2M

16 | do not here move for summary judgment of their counterclaims.  However, the

17 | uncontroverted fact of Creager's undisclosed "finder's fee" commission from MagiNet, as

18 | well as his patently illegal insider trading of publicly-traded Guest-Tek shares using non-

19 | public information, are not in dispute and therefore support an "unclean hands" defense

20 | to Creager's equitable claims, the 4th and 5th causes of action.

21 | **III.   ARGUMENT**

22 | **A.   The Undisputed Facts Defeat The First Cause of Action For Breach of Contract.**

23 | **1.   Creager did not enter any agreement with MPT.**

25 |     Creager admitted several times at deposition that he did not enter the MOU with

26 | defendant MPT, only with defendants Yoshimoto and M2M.  Since he made no

27 | agreement with MPT, his breach of contract claim against MPT cannot survive summary

28 | judgment.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

09798.00002
657887.1

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Case No.: C 05-01985 JSW

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Mr. Creager testified:

2         Q:    Did you discuss with Mr. Yoshimoto at all whether he
               would seek to obtain Board approval of the MPT Board
3              of Directors for entering an agreement with you?

4         A:    I don't recall if we discussed it, but the agreement is
               not with MPT so there was no reason for me to
5              assume he would be asking MPT for approval.

6         Q.    The agreement is – if I understand you correctly, the
               MOU is between you and Masuo Yoshimoto; right?
7
          A:    And M2M, it was my understanding.
8
          Q:    So when you and Mr. Yoshimoto signed the MOU on
9              July 11, 2004, am I correct in saying it was your
               understanding that you were entering the MOU with
10             Mr. Yoshimoto and M2M, but not with MPT?

11        A:    Yes, that's my understanding.

12   Creager Dep. at 134:21-135:16.

13        Creager, an attorney, drafted the MOU.  (Yoshimoto is not an attorney.)  The

14   MOU contains no signature line for MPT.  However, an earlier proposed consulting

15   contract that he drafted did contain a signature line for MPT.  Creager Dep. at 135:17-

16   136:12, and Ex. 57.  Creager explained this as follows:

17        Q:    Now, you made it with a signature line for MP
               Technologies, Inc., by its chairman CEO.  Do you see
18             that?

19        A:    Yes.

20        Q:    Yet the MOU that was later signed by you and
               Mr. Yoshimoto, as you've testified, was for
21             Mr. Yoshimoto's signature but not MP Technologies,
               Inc.  Why the switch?
22
          A:    The switch was at his request.  He explained to me
23             M2M's role and why it was going to be M2M.

24   Creager Dep. at 138:3-12.

25        Creager then admitted:

26        Q:    Now, you understood your deal, to the extent you had
               a deal, was with Mr. Yoshimoto, not MPT; right?
27
          A:    Yes.
28

09798.00002
657887.1

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Case No.:  C 05-01985 JSW

1  Creager Dep. at 157:15-17.[5]

2       Mr. Creager was given another opportunity to deem MPT a party to the MOU, but

3  did not:

4           Q:      Now, the MOU also, you know, refers to MPT.  Did you
                    have any belief or understanding as to how MPT might
5                   be brought to – or required to perform given that MPT
                    wasn't a party to the MOU?
6
            A:      Well, Mr. Yoshimoto was the founder and chairman
7                   and 30 percent shareholder of MPT.  So I believed that
                    he had the ability to get them to perform.
8

9  Creager Dep. at 138:20-139:1.

10      Creager's account is mirrored by the deposition of Mr. Yoshimoto, who testified:

11          [T]his memorandum of understanding is really a summary of
            the discussions that occurred between two individuals,
12          Robert Creager and Masuo Yoshimoto.  And the company,
            MPT, is not involved in here.
13

14  Deposition of Masuo Yoshimoto ("Yoshimoto Dep.") at 65:8-12.

15      Therefore, the evidence is undisputed Creager did not enter the alleged

16  agreement with defendant MPT.  MPT is entitled to summary judgment of Creager's first

17  cause of action for breach of contract.

18

19

_____

20  [5]  After the deposition, Creager's attorneys substituted a written correction to this answer:
    CHANGE "Yes." TO "Yes, in the sense that the MOU was with Mr. Yoshimoto, but AMG's
21  operation was to be for the benefit of MPT.  Also, on several occasions, Mr. Yoshimoto affirmed
    that AMG and I were working on MPT's behalf, in statements he made to me and to others in his
22  role as Chairman and CEO of MPT."  This change should be disregarded for purposes of
    summary judgment.  Schwarzer, Tashima & Wagstaffe, Cal. Prac. Guide:  Fed. Civ. Pro. Before
23  Trial (The Rutter Group 2007) Summary Judgment, ¶ 14:166.15 at 14-60.1 – 60.2 (Although "a
    deponent has the right to change the 'form and substance of his or her deposition testimony …
24  for summary judgment purposes the changes are *disregarded* unless a satisfactory explanation
    is given.").  Even if considered, this change is not evidence that MPT was a party to the MOU.
25  Rather, it suggests MPT was a third-party beneficiary of the MOU, which does not give rise to
    any obligation on the part of MPT.  *See DIRECTV, infra,* 319 F. Supp 2d 1059, 1068 (modified
26  on other grounds) ("a third party beneficiary does not have a duty to perform under the contract
    and, thus, cannot be sued for breach"); *Wagner v. U.S.,* 71 Fed. Cl. 355, 364 (Fed. Cl. 2006)
27  ("[A]lthough the parties to a contract incur an enforceable duty to an intended third-party
    beneficiary of the contract, the beneficiary makes no return promise and incurs no duties by
28  virtue of the contract.").

SCHIFFHARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2.      **The conduct of the parties establishes without dispute the equity compensation proposed in paragraph 10 of the MOU never became a contract.**

The MOU is nothing more than an "agreement to agree" which cannot be enforced as a contract unless the parties clearly intended to be bound by it.  *See, e.g., Beck v. American Health Group International*, 211 Cal. App. 3d 1555, 1562-63 (1989). The most compelling extrinsic evidence of the parties' intent, by far, is the behavior of the parties before any dispute arose.  *See Woodbine v. Van Horn*, 29 Cal.2d 95, 104 (1946) ("a construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court"); *Kennecott Corp. v. Union Oil Co.*, 196 Cal. App. 3d 1179, 1189 (1987) ("The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions").

Paragraph 10 of the MOU expressly refers to a separate "employment agreement" for Creager that would be entered into sometime in the future.  The evidentiary record is replete with instances in which Creager would have behaved differently had he considered the MOU itself to be a binding contract, or if he believed he was entitled to receive stock or stock options under paragraph 10 of the MOU. Throughout their relationship, Creager never once asserted any right to such equity compensation – indeed, he explicitly stated that he did not assert any right to it.  The first time that Creager ever made a claim for this equity compensation was when he filed this lawsuit.

a.      **Creager is an attorney.**

First, Creager is a licensed attorney who drafted the MOU.[6]  The very week he and Yoshimoto signed the MOU, Creager settled his own 2-year lawsuit against MagiNet based on breach of an alleged contract!  He, of all people, had the knowledge and

---

[6]  *See also* Complaint at ¶ 18 (discussing Creager's "executive background" and "more than 30 years' experience in international business and in high-tech companies").

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  incentive to treat the MOU as a contract if he actually believed it was one.  Yet he

2  testified:

3       Q:    During the existence of AMG, did you ever tell
             Mr. Yoshimoto that you thought the MOU was an
4             enforceable contract between you and him?

5       A:    I had no reason to do that.

6  Creager Dep. at 197:11-14.  He also testified:

7       Q:    Is there any document or writing that you are aware of
             in which either you or Mr. Yoshimoto acknowledges or
8             states their opinion that the MOU is a legal contract or
             agreement?

9
        A:    I don't recall.
10

11  Creager Dep. at 201:18-22.

12            **b.    A formal employment agreement was drafted but not
                    entered.**
13

14        Second, paragraph 10 of the MOU contemplates a future employment agreement

15  containing the equity compensation terms that Creager attempts to enforce in this

16  lawsuit.  In the month after the MOU was signed, Creager hired the Wilson Sonsini law

17  firm (with M2M's money) to prepare an employment agreement titled "Robert Creager

18  Employment Agreement."  Ex. 58, and Creager Dep. at 139:2-15.  This formal document

19  contained equity compensation language similar to, but not the same as, the language in

20  paragraph 10 of the MOU.  While the MOU contemplated equity compensation to

21  Creager for acquisitions "managed" by AMG, the Robert Creager Employment

22  Agreement materially altered this standard by providing for equity compensation to

23  Creager if AMG merely "is instrumental in assisting in an acquisition..."  The Robert

24  Creager Employment Agreement contains signature lines for Robert Creager and AMG

25  MediaVision.  Creager testified he contemplated that Mr. Yoshimoto would sign the

26  agreement on behalf of AMG MediaVision, but the agreement was never signed.

27  Creager Dep. at 144:15-23.  Therefore, Creager and Yoshimoto never reached an

28  agreement regarding equity compensation.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

09798.00002
657887.1

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Case No.:  C 05-01985 JSW

1

        **c.**     **A rich e-mail record confirms that Creager's proposal to receive equity compensation never became contractual.**

2

3         In September, 2004, MPT took steps toward acquiring Guest-Tek.  Creager wrote

4  to MPT's Ryuzo Nakazumi:

5             I understand AMG is not legally part of MPT …

6             I also understand that you are in charge of acquisitions.  If I
               can be of service to you please do not hesitate to ask.

7

8             With respect to acquisitions which I introduced to MPT, such
               as Guest-Tek, I would very much appreciate if you would be
               so kind to keep me informed about what is going on.  I have

9             personal relationships there and prefer not to be
               embarrassed by not knowing what is going on.

10

11  Ex. 29, and Saitoh Dep. at 99:18-101:22.[7]

12        He also wrote to Yoshimoto:

13             In order to support MPT after finding, for my own information
               purposes I would like to be an informal member of the

14             acquisition team for each M&A target.  I want only to be
               informed, not to be part of the day-to-day execution effort.

15

16  Ex. 31, and Saitoh Dep. at 124:1-30.

17        Thus, by September 28, 2004 Creager knew that his hope of equity compensation

18  which he had proposed in paragraph 10 of the MOU would never come to fruition and

19  that his role, if any, at the fringes of the contemplated acquisition by MPT could not

20  entitle him to equity in Guest-Tek.  He privately protested to Yoshimoto:

21             Now I am not so sure that I properly understand what AMG is
               supposed to be doing.  Even AMG's proper role with Guest-

22             Tek must be discussed.  I have the relationship with Arnon
               and the experience to manage Guest-Tek for MPT but

23             according to Nakazumi-san I should not be involved.

24  Ex. 64, and Creager Dep. at 172:15-22.  He also tried to revive the MOU:

25             You and I made an agreement when we met in Australia.  We
               even wrote it down and signed it.  Is that agreement still

26

---

27  [7]  Creager chose his words carefully.  He first sent a draft of this e-mail to Mika Saitoh for her to
     review, as the e-mail responded to her earlier phone call with Nakazumi.  Ex. 65 and Creager

28  Dep. at 178:23-180:24.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  valid?

2  Ex. 64.  Creager testified Yoshimoto did not respond to his question.  Creager Dep. at

3  175:24-176:19.[8]

4          In early December, 2004, as the Guest-Tek acquisition neared completion,

5  Creager continued to angle for compensation beyond his $300,000 annual salary.  With

6  the assistance of Ms. Saitoh, he prepared a PowerPoint presentation which termed his

7  original plan with Yoshimoto not a contract, but the "Original Vision."  Ex. 68, and

8  Creager Dep. at 192:11-193:3.  In this document, the "Original Vision" is contrasted with

9  "Actual Events" and a scenario for "How to Fix?"  The "Original Vision" and "How to Fix?"

10  pages, like paragraph 10 of the MOU, place Creager's company, AMG, in the center of

11  acquiring and managing corporate targets; the "Actual Events" page shows that AMG

12  simply found Guest-Tek.  Had Creager considered the MOU to be a binding contract, he

13  surely would not have referred to its terms as a "vision."

14          As AMG ran out of money in early 2005, it became apparent to Creager that he

15  and AMG served no useful purpose to Yoshimoto and it was doubtful Yoshimoto, M2M,

16  or anyone else would continue to pay the salaries and expenses of Creager and his two

17  employees.  Many e-mails were sent between the parties addressing potential roles

18  AMG might serve and how Creager and AMG might be compensated.  On February 19,

19  2005, in one such e-mail Creager wrote to Yoshimoto:

20          According to our agreement I should receive stock and stock
        options in Guest-Tek and LogicLink.  Please note that *I do*
21          *NOT insist on our original agreement*, but I do insist that we
        now agree on a fair settlement for those two deals and a new
22          agreement for future deals.

23  _____

24  [8]  Creager also testified:

25          Q:    Did [Yoshimoto] – by this date of September 28, 2004, had
              you ever discussed with him, since the MOU was signed,
26              whether there was an operative agreement between you
              and him?

27          A:    No.  We never discussed the agreement after we signed.

28  Creager Dep. at 177:4-9.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Ex. 81 and Creager Dep. at 227:6-9 (emphasis added). Creager testified the agreement

2   he referred to was the MOU of July 11, 2004. Creager Dep. at 227:24-228:1. He also

3   testified:

4           Q:     Now, at any time before February 19, 2005, did you
                     ever tell Mr. Yoshimoto you thought you were entitled

5                    to stock or stock options under the MOU?

6           A:     I don't remember. I don't think so. Again, we had an
                     agreement. It had been signed a mere six months

7                    earlier. So, yeah, I didn't feel the need to keep
                     reminding everyone of my rights under the agreement.

8

9   Creager Dep. at 232:20-233:2.

10        The next day, February 20, 2005, Creager sent MPT's Nakazumi an e-mail which

11  makes no sense if Creager thought he was entitled to equity compensation under

12  paragraph 10 of the MOU. In the e-mail he asked MPT, in effect, for bonuses to AMG:

13          Since MPT has received all of the benefit of our acquisitions
            work it seems fair that maybe MPT should pay for our

14          expenses and time spent on such work.

15          …

16          Please inform me if you would agree to pay consulting fees to
            AMG for our time spent on MPT acquisition projects and if so

17          how much you would suggest to pay.

18          Finally, Mr. Yoshimoto informed me a few months ago that
            AMG would receive a "finder's fee" for the Guest-Tek

19          acquisition. Please consider that and inform me if that is a
            real possibility.

20

21  Ex. 70 and Creager Dep. at 205:14-23.[9] Creager acknowledges he and the two others

22  at AMG were paid salary for their work ($387,500 in six months, out of the $500,000

23  funded by M2M), and that in this e-mail he was seeking additional compensation.

24  Creager Dep. at 206:11-21.

25

26  _____

27  [9] This was Creager's second request to MPT for consulting fees and a finder's fee for the Guest-
    Tek acquisition. *See* Ex. 49 and Creager Dep. at 56:9-13. *See also* Ex. 69 and Creager Dep. at

28  202:6-12. MPT subsequently agreed to pay, and did pay, a finder's fee of $34,000.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

        **d.   Creager never even asked Yoshimoto to pay him equity compensation under the MOU.**

After it became official that Yoshimoto would not provide further funding for AMG, Creager sent numerous e-mails to Yoshimoto asking for various items of additional compensation for himself and the two AMG employees, including severance pay (which had never before been discussed or agreed to) and payment of AMG's outstanding expenses, an amount exceeding $50,000. *See, e.g.*, Exs. 76, 77, 78 and 80, and Creager Dep. at 217:1-218:17. In none of these communications did Creager make any reference to the MOU or ask for equity in the acquired companies.

In fact, the only time that Creager claims he told Yoshimoto he was entitled to *anything* under the MOU was in a supposed phone call in March, 2005, after their relationship ended.[10] According to Creager, the phone call was vague:

> Q:   And earlier you described a phone call in March of 2005 where you said that you told Mr. Yoshimoto you had an agreement that you intended to hold him to. Was it in that phone call where you addressed with him amounts that you believe that he owed you personally?
>
> A:   Well, indirectly. We didn't discuss specific amounts, but I referred to the agreement which has amounts in it.
>
> Q:   Did you ever tell Mr. Yoshimoto that you thought that you should receive 3 percent of the stock of any acquired company pursuant to the MOU?
>
> A:   We had an agreement to that effect so I didn't see the need of telling him that.

---

[10] Mr. Yoshimoto disagrees that such a phone call took place. Creager testified he does not recall any circumstances of the call, including who initiated the call, where he was, what phone he used and how long the call lasted. Creager Dep. at 197:15-201:9 and 222:25-225:13. In fact, Mr. Creager's own declaration contradicts his testimony:

> "Yoshimoto sent me an e-mail dated April 6, 2005 – the first time that I had heard from him since his March 2, 2005 e-mail cutting off AMG's funding."

Declaration of Robert R. Creager in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Service of Process, at ¶ 32, ¶¶ 28-31, Ex. F to Mullen Dec.

09798.00002
657887.1

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT       Case No.: C 05-01985 JSW

1  Creager Dep. at 220:21-221:8.

2      In sum, Creager's conduct is wholly inconsistent with a belief the equity

3  compensation proposal in the MOU was in effect, or entitled him to further

4  compensation.  No reasonable factfinder can conclude from the evidence that the parties

5  considered paragraph 10 of the MOU a binding agreement for equity compensation.

6      **3.      Creager has waived any rights he had to enforce the MOU.**

7      Noted above, Creager stated in writing on February 19, 2004: "According to our

8  agreement I should receive stock and stock options in Guest-Tek and LogicLink.  Please

9  note that I do NOT insist on our original agreement ..."  In doing so, he waived any rights

10 he may have had under the MOU to receive the stock and stock options he seeks in this

11 lawsuit.

12     "Waiver is the intentional relinquishment of a known right after knowledge of the

13 facts."  *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe and Takeout III, Ltd.*, 30 Cal.

14 App. 4th 54, 60 (1994).  "The pivotal issue in a claim of waiver is the intention of the

15 party who allegedly relinquished their known legal right."  *Id.*  To the extent Creager

16 believed he had any rights to the stock or stock options under the MOU, his emphatic

17 disavowal of them in this e-mail (followed by no other communication on the subject)

18 constitutes an intentional waiver of such rights.

19     **B.      Creager's Second Cause of Action for Breach of Covenant of Good
            Faith and Fair Dealing is Not a Separate Basis of Recovery.**
20

21     The implied covenant of good faith and fair dealing is a promise, implied in all

22 contracts, to give the other party the cooperation it needs to successfully perform its

23 contractual obligation.  1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 798

24 at 892.  However, where breach of an actual contract is alleged, a separate implied

25 covenant claim, based on the same breach, is superfluous.  *Guz v. Bechtel Nat'l, Inc.*, 24

26 Cal.4th 317, 327 (2000).  Creager's second cause of action for "Breach of Covenant of

27 Good Faith and Fair Dealing" simply states, "Defendants, in bad faith, have failed to

28 provide Creager the compensation he has earned pursuant to the agreement."

SCHIFFHARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-15-

1   Complaint at ¶ 50.  In *Guz,* the California Supreme Court affirmed summary judgment of

2   an employee's implied covenant cause of action where the employee had also asserted

3   a cause of action for breach of contract.  *Id.* at 352-53.

4       As a separate matter, implied covenant actions sounding in tort are only available

5   in insurance bad faith actions; outside that context, a party suing for breach of the

6   implied covenant of good faith and fair dealing can only recover contract damages.  *See*

7   *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 684, 686 (1988); *Freeman & Mills, Inc., v.*

8   *Belcher Oil Co.,* 11 Cal.4th 85, 95 (1995).

9       Finally, if the court finds that no contract existed between Creager and any of the

10  defendants, Creager's implied covenant claim against that defendant fails as a matter of

11  law, because a contractual relationship is a prerequisite for such a claim.  *Smith v. S.F.,*

12  225 Cal. App. 3d 38, 49 (1990).

13  **C.    Creager Lacks Evidence to Support His Third Cause of Action for Fraud.**

14
        **1.    Creager lacks evidence of any intention to mislead.**
15

16      "Fraud is an intentional tort, the elements of which are (1) misrepresentation;

17  (2) knowledge of falsity; (3) intent to defraud, *i.e.,* to induce reliance; (4) justifiable

18  reliance; and (5) resulting damage."  *Cicone v. URS Corp.,* 183 Cal. App. 3d 194, 200

19  (1986); *see also* Civ. Code §§ 1709-1710; 5 Witkin, Summary of Cal. Law (9th ed. 1988)

20  *Torts,* § 676, at 778.)  Fraud is a charge that is easily made but less often substantiated.

21  In order to establish a cause of action for fraud, a plaintiff must plead and prove in full,

22  factually and specifically, all of the elements of the cause of action.  *Wilhelm v. Pray,*

23  *Price, Williams & Russell* ,186 Cal. App. 3d 1324, 1331, 231 Cal. Rptr. 355 (1986).)

24  General and conclusory claims of fraud will not suffice.  (*Id.*; see also 5 Witkin, Cal.

25  Procedure (3d ed. 1985) *Pleading,* § 662, at 111.

26      Creager's allegations fail to meet this standard, and the uncontroverted evidence

27  establishes that he could never prove a cause of action for fraud against any of the

28  Defendants.  Indeed, at his deposition, Creager could not point to specific facts

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  suggesting any of the defendants misled or defrauded him.  *See* Creager Dep. at 289:10

2  – 290:18.  Indeed, the acts of fraud that Creager alleges in his complaint (that Yoshimoto

3  promised to sign AMG corporate documents but did not, and that Yoshimoto and

4  Nakazumi gave him certain assurances – *see* Complaint at ¶¶ 55, 56) occurred well after

5  Creager alleges he undertook to operate AMG in reliance on the MOU.  The fraud

6  allegations, at best, simply rehash the terms of the MOU by stating Yoshimoto had no

7  intention of performing them at the time he signed the MOU.  Complaint, ¶ 57.  These

8  allegations do not support a separate cause of action for fraud against any of the

9  Defendants.  *See, e.g., Younan v. Equifax, Inc.,* 111 Cal. App. 3d 498, 511-513 (1980).[11]

10          **2.      The evidence establishes Creager has suffered no damages as**
            **a result of the alleged fraud.**

11

12          As a separate matter, Creager has not suffered the losses he alleges, or any

13  consequential damage, as a result of the alleged fraud.  *See, Younan v. Equifax, Inc.,*

14  *supra,* 111 Cal. App. 3d at 512, 169 Cal. Rptr. at 486 (consequential damages are

15  essential element to cause of action for fraud); Cal. Civ. Code § 3343 (limiting damages

16  for fraud to out-of-pocket losses and consequential damages, and prohibiting benefit-of-

17  the-bargain recovery); *see also* 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts,

18  § 1714 at 1246.  Rather, he walked away with a finder's fee of $1,062,750 and over

19  $200,000 in salary and bonus.  He attempts to itemize fraud damages at ¶ 60 of the

20  complaint:

21  _____

22  [11] Further, as to defendant MPT, Creager's testimony that he did not enter the MOU with MPT
    (*see* above) eliminates his fraud claim against MPT to the extent it is based on the same

23  supposed assurances as the MOU.  Creager also alleges that MPT's Nakazumi said AMG
    "would be taken care of" and would "continue to receive funding."  Creager could not have relied

24  on these statements because they were not made to him and were made in late September
    2004, after Creager already set to work with Yoshimoto.  They are contained in a memo Mika

25  Saitoh wrote, dated September 28, 2005.  (Ex. 132 and Saitoh Dep. at 209:5-210:22.)  Further,
    they are taken out of context, a 90-minute discussion between Nakazumi and Saitoh in which

26  Nakazumi said, among other things, that "AMG is not representing MPT"; and "Mr. Y and Bob
    have been running blind – without having established a relationship."  *Id.*  Moreover, Creager

27  admits Yoshimoto never told him MPT would provide further financing for AMG, and said there
    was no point in time when he was waiting for MPT's board to make a decision regarding AMG.

28  (Creager Dep. at 192:3-10.)

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

60.   The aforementioned false representations by defendants and the subsequent successfully committed fraud resulted in Plaintiff's loss of personal funds; deprivation of the economic benefits that he reasonably anticipated through the agreement and his diligent and successful performance; considerable but uncompensated expenditure of time; and opportunity costs, all in an amount to be proven at trial.

Yet Creager admits that he received between $187,500 and $212,500 in salary and bonus for his six to seven months of work with Mr. Yoshimoto (Creager Dep. at 38:4-41:18) and that he was fully reimbursed all expenses, including travel expenses, from AMG's start-up funds.  (Creager Dep. at 53:7-63:7.)  This included an undocumented "expense reimbursement" check of $50,000 that he wrote to himself as AMG ran short of funds.  (Id.)  Creager also admits Yoshimoto paid AMG's expense overrun.  (Creager Dep. at 206:14-17.)  As for "opportunity costs," Creager's resume (Ex. 41 to Creager Dep.) shows he operated a company named All-Trades.net between April 2003 and May 2004, when "the company was sold to Nexa"; and Creager testified he has been unemployed since leaving AMG (Creager Dep. at 40:21-43:7).  There is no apparent opportunity that Creager passed up; certainly no opportunity that would have paid him in excess of the amounts he received working with Yoshimoto.

In short, Creager has no provable consequential damages.  Thus, even if he could prove the other essential elements of fraud, his fraud cause of action still cannot survive summary judgment.

**D.   Creager's Fourth Cause of Action for Violation of Section 17200 of the California Business & Professions Code Fails as a Matter of Law.**

California Business and Professions Code Section 17200, *et seq.*, (the "Unfair Competition Law" or "UCL") addresses acts of unfair competition.  Under the UCL, the plaintiff must prove the defendant's business practice is either (1) unlawful, (2) unfair, or (3) fraudulent.  *See* Cal. Bus. & Prof. Code § 17200; *Albillo v. Intermodal Container Servs., Inc.*, 114 Cal. App. 4th 190, 206 (2003).  In evaluating UCL claims, courts address these three "prongs" separately.  *See, e.g., Nat'l Rural Telecomm. Coop. v.*

SCHIFFHARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                Case No.: C 05-01985 JSW

*DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1074-78 (C.D. Cal. 2003).  Creager cannot prove the elements of any prong of the UCL.

**1.   The "unlawful" prong of the UCL applies only to violations of statutes and court orders.**

Creager cannot prove the "unlawful" prong of the UCL because it applies only to violations of statutes or court orders, and does not apply to mere torts or breaches of contract.  In *DIRECTV*, *supra*, a cooperative of satellite television service distributors (NRTC) filed several suits against DIRECTV, a satellite television services provider, alleging, *inter alia*, that DIRECTV violated the UCL by breaching its distribution agreement with the plaintiffs.  319 F. Supp. 2d at 1065-66.  The cases were consolidated, and DIRECTV filed several motions for summary judgment.  *Id.* at 1064.

The court agreed with DIRECTV that "unlawful practices" under the UCL must constitute statutory violations of breaches of "court-made" law, "not a simple tort [or breach of contract] claim."  *Id.* at 1074 (brackets in original).  "Court-made" law refers to "prior court order[s]" rather than to common law.  *Id.*  A breach of contract, by itself, cannot serve as a predicate for a UCL claim.  *Id.; see also Acculmage Diagnostics Corp. v. TeraRecon, Inc.*, 260 F. Supp. 2d 941, 954 (N.D. Cal. 2003) ("[w]hile section 17200 has broad application . . . its scope is restricted to violations of law, not contract.")

Here, Creager bases his UCL claim on the defendants' alleged "wrongful conduct."  Complaint, ¶ 63.  Yet he has no evidence the defendants violated a statute or a court order.  The "unlawful" prong fails.

**2.   The "unfair" prong of the UCL requires a claim to be defined by a legislatively declared policy.**

To satisfy the "unfair" prong of the UCL, a plaintiff must invoke a legislatively-declared public policy.  *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163 (1999); *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1166 (2000) (extending *Cel-Tech* to non-competitors; *see also, In Re Firearms Cases*, 126 Cal. App. 4th 959, 980 (2005)).  In *Schnall*, car renters sued Hertz, alleging a provision in Hertz's

SCHIFFHARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-19-

standard rental agreement that required renters to choose between buying fuel from Hertz at the commencement of the rental or paying a fuel service charge if they returned the car with less than a full tank of gas violated the UCL. 78 Cal. App. 4th at 1149. The court stated, "*any* claims of unfairness under the UCL should be defined in connection with a legislatively declared policy." *Id.* at 1166 (emphasis in original). Applying this test, the court in *Schnall* found the trial court properly sustained Hertz' demurrer as to a claim challenging the amount of the fuel service charge, but reversed the demurrer as to a separate claim that Hertz unfairly concealed the fuel service charge from consumers, citing former Civil Code section 1936(m)(2). *Id.; see also Gregory v. Albertson's, Inc.,* 104 Cal. App. 4th 845, 854 (2002) ("[W]here a claim of an unfair act or practice is predicated on public policy, we read *Cel-Tech* to require that the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions.").

Here, Creager cannot present any evidence the defendants violated a public policy tethered to the constitution or legislation. He makes no such allegation. *See* Complaint, ¶ 64. The "unfair" prong fails.

### 3. The "fraudulent" prong of the UCL does not apply to practices that are not likely to deceive members of the public.

A business practice is fraudulent under the UCL only if "members of the public are likely to be deceived." *Daugherty v. Am. Honda Motor Co., Inc.,* 144 Cal. App. 4th 824, 838 (2006). In *DIRECTV,* the court held "it is necessary under the 'fraudulent' prong [of the UCL] to show deception to some members of the public, or harm to the public interest, and not merely to the direct competitor or other non-consumer party to a contract." 319 F. Supp. 2d at 1078 (quoting *Watson Labs, Inc. v. Rhone-Poulenc Rorer, Inc.,* 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001). The court said, "Sophisticated companies, like Plaintiffs here, are not members of the general public." *Id.* at 1078 n. 28. Because NRTC "did not make a showing that the public was impacted at all by DIRECTV's alleged actions," the court granted summary judgment of claims brought

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    under the "fraudulent" prong of the UCL.  *Id.* at 1078.

2        Here, again*,* Creager cannot prove a UCL claim premised on "fraudulent" conduct

3    because he cannot prove the defendants have harmed the general public.  He claims to

4    be a sophisticated businessman and attorney who incurred a personal loss.  The

5    "fraudulent" prong of the UCL fails.  Because this lawsuit does not satisfy any of the

6    three prongs, Creager's fourth cause of action under the UCL should be dismissed.

> ### 4.    Creager's UCL claim also fails because he seeks compensatory damages, not restitution.

9        The fourth cause of action also is defective because Creager seeks only

10   compensatory damages.  Remedies under the UCL are limited to injunctive relief and

11   restitution, and compensatory damages are not available.  *Korea Supply Co. v.*

12   *Lockheed Martin Corp.,* 29 Cal.4th 1134, 1144 (2003); Cal. Bus. & Prof. Code § 17203;

13   13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 125 at 442.

14       In *Korea Supply,* the California Supreme Court defined restitution in the UCL

15   context as follows:

16           [A]n order for "restitution" is one "compelling a UCL defendant
             to return money obtained through an unfair business practice
17           to those persons in interest from whom the property was
             taken, that is, to persons who had an ownership interest in
18           the property or those claiming through that person."  The
             object of restitution is to restore the status quo by returning to
19           the plaintiff funds in which he or she has an ownership
             interest.

21   29 Cal.4th at 1149 (citing *Kraus v. Trinity Mgmt. Servs., Inc.*, 23 Cal.4th 116, 126-27

22   (2000)) (internal citations omitted).  This includes property that was once in the plaintiff's

23   possession as well as property in which he or she has a "vested interest."  *Korea Supply*,

24   29 Cal.4th at 1149.  It does not include property in which plaintiff's interest is a mere

25   "expectancy" (*Id.* at 1149-50) or a "lost business opportunity."  *Id.* at 1151.

26       Here, Creager terms his claim "restitution"  (Complaint, ¶ 66), but seeks only

27   money and/or stock he says he should be paid under the MOU, which he alleges the

28   defendants "wrongfully retained."  *Id.*  Calling relief sought "restitution" has no impact if

SCHIFFHARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Case No.:  C 05-01985 JSW

1  the court finds that the relief sought is actually damages. *Korea Supply,* 29 Cal.4th at

2  1148-49. In *DIRECTV, supra,* the court held a distributor suing a services provider

3  under the UCL for breach of distribution agreements could not recover the profits it

4  would have obtained "if [defendant] had performed in accordance with the . . .

5  agreements" because this would constitute "expectation damages" rather than

6  restitution. 319 F. Supp. 2d at 1080 (applying California law).

7      Creager plainly seeks to recover the benefit of his alleged bargain with the

8  defendants, an "expectancy" interest. This claim for damages cannot be made under the

9  UCL, so the fourth cause of action should be dismissed.

10     **E.     Creager's Fifth Cause of Action for Unjust Enrichment Fails Because
            Unjust Enrichment is Simply Restitution.**

11

12     "Unjust enrichment" is not a cause of action, but rather is synonymous with

13  restitution:

14          The phrase "Unjust Enrichment" does not describe a theory
            of recovery, but an effect:  the result of a failure to make

15          restitution under circumstances where it is equitable to do so.
            Unjust enrichment is a general principle, underlying various

16          legal doctrines and remedies, rather than a remedy itself. It
            is synonymous with restitution.

17

18  *Melchior v. New Line Prods., Inc.,* 106 Cal. App. 4th 779, 793 (2003) (emphasis added;

19  internal citations omitted). Unjust enrichment is "designed to restore the aggrieved party

20  to his or her former position by return of the thing to its equivalent in money." *McBride v.*

21  *Boughton,* 123 Cal. App. 4th 379, 388 n.6 (2004). *See also McKell v. Washington Mut.,*

22  *Inc.,* 142 Cal. App. 4th 1457, 1490 (2006) ("There is no cause of action for unjust

23  enrichment.").

24     As discussed above in part D, Creager seeks compensatory damages for breach

25  of contract, not restitution. He does not seek to be restored to his former position. He

26  seeks to obtain the benefit of his alleged bargain with defendants, which does not

27  constitute restitution. *See Korea Supply, supra,* 29 Cal.4th at 1149-50 (2003).

28  Therefore, Creager cannot prevail under a claim fashioned as "unjust enrichment."

SCHIFFHARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

09798.00002
657887.1

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Case No.:  C 05-01985 JSW

**F.    Creager's Unclean Hands Defeat the Equitable Causes of Action.**

The restitution or "unjust enrichment" Creager seeks in the fourth and fifth causes

of action is an equitable remedy, subject to the equitable defense of unclean hands:

> The guiding doctrine in this case is the equitable maxim that
> 'he who comes into equity must come with clean hands.'
> This maxim is far more than a mere banality. It is a self-
> imposed ordinance that closes the doors of a court of equity
> to one tainted with inequitableness or bad faith relative to the
> matter in which he seeks relief, however improper may have
> been the behavior of the defendant. That doctrine is rooted
> in the historical concept of court of equity as a vehicle for
> affirmatively enforcing the requirements of conscience and
> good faith. This presupposes a refusal on its part to be 'the
> abetter of iniquity.'

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806,

814 (1945). In *Wilson v. S.L. Rey, Inc.*, 17 Cal. App. 4th 234, 244-45 (1993), the Court

of Appeal affirmed judgment against the plaintiff in a restitution action concerning certain

real property, where the trial court found that the plaintiff had refused to pay taxes and

liens on the property, account for royalties, rents, and profits, and misused the

bankruptcy court to delay and defeat the legitimate claims of creditors. Based on this,

the court held that the plaintiff "came before it with unclean hands," and that its claim for

restitution was therefore barred. *Id.*

As set forth above, Creager furtively secured a $1,062,750.00 "finder's fee" from

shareholders of MagiNet, in breach of his fiduciary duties. To make matters worse,

Creager breached his handshake deal with Yoshimoto to dismiss this lawsuit in

exchange for Yoshimoto approving MagiNet's payment of the finder's fee to Creager.

Creager's excuse to Yoshimoto, "my attorneys have informed me . . . it cannot be

stopped," was a bald lie made by an attorney.

While Creager denies he committed insider trading of approximately 103,000

shares of Guest-Tek stock, he has admitted to the facts establishing that he secretly

bought the shares (worth about $400,000) after he learned non-public information that

MPT might acquire Guest-Tek and that he later sold at least a portion of those shares at

a profit, all during the time he was CEO of AMG. Under the principles of equity, this

SCHIFFHARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

09798.00002
657887.1

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Case No.: C 05-01985 JSW

1    misconduct precludes an equitable award to Creager under the fourth or fifth causes of

2    action.

3         **G.    Creager's Sixth Cause of Action for Common Counts Fails Because**
         **He Does Not Seek a Certain Sum of Money.**
4
              **1.    Creager's alleged damages are not specific.**
5

6         Common counts are a "simplified form of pleading normally used to aver the

7    existence of various forms of monetary indebtedness." *McBride v. Boughton*, 123 Cal.

8    App. 4th 379, 394 (2004).  The essential allegations of a common count are "(1) the

9    statement of indebtedness in a certain sum, (2) the consideration, *i.e.,* goods sold, work

10   done, etc., and (3) nonpayment."  4 Witkin, Cal. Proc. (4th ed. 1997) Pleading, § 518 at

11   609; *see also Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 460 (1997).

12        Creager does not seek to recover indebtedness "in a certain sum."  His complaint

13   does not even provide an estimate of the amount of money he claims, but rather

14   damages "according to proof."  *See* Complaint, 17:8-16.  His cause of action alleging

15   common counts should be dismissed.

16             **2.    Further, common counts are improper where the defendant's**
             **obligation is something other than the payment of money.**
17

18        Creager claims that under the MOU, he is entitled to three percent of the stock of

19   several companies, and a ten-year option to buy an additional two percent of their stock

20   at the price per share at the time of MPT's acquisition.  Complaint at ¶ 3.  Where the

21   defendant's obligation under an alleged contract is something other than the payment of

22   money, it is insufficient to plead common counts.  4 Witkin, Cal. Proc. (4th ed. 1997)

23   § 516 at 607; *O'Connor v. Dingley*, 26 Cal. 11, 22 (1864).

24             **3.    Moreover, Creager's common count claim must fail if his**
             **breach of contract claim fails.**
25

26        Creager's first cause of action alleges breach of contract based on specific factual

27   allegations.  The sixth cause of action for common counts seeks the same recovery,

28   based on the same facts.  *See* Complaint, ¶ 72 ("Defendants are indebted to Plaintiff for

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Case No.:  C 05-01985 JSW

1   the monies that they have retained in violation of Plaintiff's written agreement with

2   Defendant Yoshimoto"). If the Court adjudicates the breach of contract claim in favor of

3   any defendant, the common count claim must also be adjudicated in the defendant's

4   favor:

> It is the established law of California that, if plaintiff is not
> entitled to recover under one count in a complaint wherein all
> the facts upon which his demand is based are specifically
> pleaded, it is proper to sustain a demurrer to a common count
> set forth in the complaint, the recovery under which is
> obviously based on the same set of facts specifically pleaded
> in the other count.

9   *Hays v. Temple*, 23 Cal. App. 2d 690, 695 (1937); *see also* 4 Witkin, Cal. Proc. (4th ed.

10  1997) Pleading, § 529 at 616.

12  DATED:  June 29, 2007          SCHIFF HARDIN LLP

14                                 By _____
                                       Robert B. Mullen
15                                 Attorneys for Defendant
                                   M.P. TECHNOLOGIES, INC.

17  DATED:  June 29, 2007          MOSLEY & GEARINGER LLP

19                                 By _____
                                       Brian Gearinger
20                                 Attorneys for Defendants
                                   MASUO YOSHIMOTO and M2M, INC.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

09798.00002
657887.1

DEFENDANT M.P. TECHNOLOGIES, INC.'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Case No.:  C 05-01985 JSW