1  NIALL P. McCARTHY (#160175)
   LAURA SCHLICHTMANN (#169699)
2  **COTCHETT, PITRE & McCARTHY**
   San Francisco Airport Office Center
3  840 Malcolm Road, Suite 200
   Burlingame, CA 94010
4  Telephone: (650) 697-6000
   Facsimile: (650) 692-0577
5  E-mail: nmccarthy@cpmlegal.com
   lschlichtmann@cpmlegal.com
6
   Attorneys for Plaintiff Robert R. Creager
7

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10

11                                          Case No. C05-01985 JSW

12                                          **PLAINTIFF'S MEMORANDUM
                                            OF POINTS AND AUTHORITIES**
13                                          **IN OPPOSITION TO
                                            DEFENDANTS' MOTION FOR**
14  **ROBERT R. CREAGER**, an individual,   **SUMMARY JUDGMENT**

15           Plaintiff,                      Date:  August 3, 2007
                                             Time:  9:00 a.m.
16      vs.                                  Place: Courtroom 2, 17th Floor

17  **MASUO YOSHIMOTO**, an individual,      Honorable Jeffrey S. White
    **M.P. TECHNOLOGIES, INC.**, a corporation, and
18  **M2M, INC.**, a corporation,

19           Defendants.

20

21

22

23

24

25

26

27

⊛
LAW OFFICES
COTCHETT,
PITRE &
McCARTHY       28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .......................................................... 1

II.   STATEMENT OF FACTS ................................................. 1

    A.    Formation of the July 2004 MOU and Key Terms ........................ 1

        1.    2004: MPT Goes Public and Seeks to Expand ..................... 1

        2.    Creager and Yoshimoto Meet, Reach Initial "Hand-Shake Agreement," Then Firm It Up in Writing as July 2004 Memorandum of Understanding ................................................. 2

        3.    Key Terms of the July 2004 MOU ............................... 4

        4.    Yoshimoto Reconfirms the Parties' Intent in September 2004 E-Mail ... 6

        5.    Yoshimoto Admits He First Called the MOU a Mere "Wish List" Only After This Lawsuit Was Filed, and That He Signed the MOU Because He Knew Creager Insisted on a Written Agreement to Define Both Sides' Roles ................................................... 7

    B.    Creager Exceeds the MOU's Performance Measures by Helping MPT and Its Subsidiaries Acquire Four Companies by Early 2005 – Turning MPT into a World Leader in Its Industry ......................................... 7

        1.    Creager Identifies Guest-Tek and Helps MPT Acquire It ............ 7

        2.    Creager's Role in Guest-Tek's Acquisition of Golden Tree ........... 9

        3.    Creager Brings About MPT's Acquisition of LogicLink .............. 9

        4.    Through Creager, MPT Acquires MagiNet ....................... 10

    C.    As Creager Helps MPT Acquire More Subsidiaries, Uncertainty Emerges over AMG's Role in the Expanding MPT Family; Yoshimoto Pulls the Plug .. 11

    D.    MagiNet Contacts Creager About Paying Him the $1 Million Finder's Fee; Yoshimoto Gives Written Approval for the Payment in Exchange for Creager's Agreement to Invest in a New Southern California Venture, But Yoshimoto Fails to Follow Up on the Venture ...................................... 12

III.  STANDARD OF REVIEW ................................................ 14

IV.   LEGAL ARGUMENT ................................................... 15

    A.    The July 2004 MOU Signed by Creager and Yoshimoto Is a Contract Enforceable Against Both Yoshimoto and MPT ........................ 15

    B.    Defendants' Attack on Creager's Claim for Breach of the Covenant of Good Faith and Fair Dealing Relies on Inapposite Authorities ............. 18

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

C.    Masuo Yoshimoto's Testimony Supplies Evidence of His Intent to Mislead Creager in Signing the MOU, and Defendants' Claim of "No Damage" Is Millions of Dollars Off the Mark; Summary Judgment Should Be Denied on Creager's Fraud Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     1.    Yoshimoto's Testimony Supplies Evidence of Fraudulent Intent . . . . . . 19

     2.    Defendants' "No Damages" Argument Ignores the Terms of the MOU . 20

D.    Summary Judgment Is Inappropriate on Creager's "Section 17200" Claim, in Part Because He Has Viable Fraud Claims Under Sections 1709 and 1710 of the California Civil Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     1.    Defendants' Argument That the Section 17200 Claim Fails Because Creager "Actually" Seeks Damages Instead of Restitution Ignores the Complaint and Relies on Inapt Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

E.    The Unjust Enrichment Claim Should Not Be Summarily Adjudicated . . . . . . 21

F.    Defendants' "Unclean Hands" Argument Relies on Disputed Facts . . . . . . . . . 22

G.    Summary Judgment Should Not Be Granted as to the Common Counts Claim, Since Portions of Creager's Claim for Relief Are a Fixed Sum and Others Can Readily Be Reduced to a Sum of Money . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

1

# TABLE OF AUTHORITIES

2

**Page**

3

# CASES

4   *Anderson v. Liberty Lobby, Inc.,*
        477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5

    *Calistoga Civic Club v. City of Calistoga,*
6       143 Cal. App. 3d 111 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

7   *Celotex Corp. v. Catrett,*
        477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

8

    *Cortez v. Purolator Air Filtration Products Co.,*
9       23 Cal.4th 163 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

10  *Glendale City Employees' Association, Inc. v. City of Glendale,*
        15 Cal. 3d 328 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

11

    *Guz v. Bechtel Nat'l, Inc.,*
12      24 Cal.4th 317 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

13  *Hicks v. E.T. Legg & Assocs.,*
        89 Cal. App. 4th 496 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

14

    *Korea Supply Co. v. Lockheed Martin Corp.,*
15      29 Cal. 4th 1134 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

16  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
        475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

17

    *National City Police Officers' Association v. City of National City,*
18      87 Cal. App. 4th 1274 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

19  *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.,*
        182 F.3d 157 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

20

    *T.W. Elec. Service v. Pacific Elec. Contractors,*
21      809 F.2d 626 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

22  *Ting v. United States,*
        927 F.2d 1504 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

23

24

# STATUTES AND RULES

25

    Cal. Civ. Code § 1710(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

26

    Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

27

28

✪
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1    I.    **INTRODUCTION**

2           Plaintiff Robert Creager ("Creager") of San Francisco helped Defendants Masuo

3    Yoshimoto and M.P. Technologies, Inc. ("MPT"), expand their business – providing video on

4    demand and high-speed Internet access to hotel chains and resorts – into a worldwide industry

5    leader.  Creager achieved these results pursuant to a written agreement that he had signed with

6    Yoshimoto, MPT's founder, CEO, and chair of its board of directors.

7           However, Yoshimoto and MPT then denied Creager the compensation due to him under

8    the agreement for the results he had obtained for them, and Creager brought this suit, a diversity

9    action, under California law.  His claims are breach of contract, breach of the covenant of good

10   faith and fair dealing, fraud, violation of California's unfair competition law (section 17200 of

11   the Business and Professions Code), unjust enrichment, and common counts.

12          Defendants Yoshimoto, MPT, and M2M, Inc. (MY's personal investment company and

13   alter ego) ("M2M"), have moved for summary judgment as to all of Creager's claims.  Their

14   motion relies on a mix of incomplete and distorted evidence, and arguments devoid of legal

15   authority.  The motion should be denied in its entirety.

16   II.   **STATEMENT OF FACTS**

17          A.    **Formation of the July 2004 MOU and Key Terms**

18                 **1.    2004: MPT Goes Public and Seeks to Expand**

19          Defendant Masuo Yoshimoto ("Yoshimoto") is a sophisticated businessman with decades

20   of experience in the high-tech sector.  (Schlichtmann Decl., Exh. E.)  In 1986, he founded

21   Defendant M.P. Technologies, Inc. ("MPT"), and in early 2004 he took it public on the Tokyo

22   stock exchange.  (*Id.*)  As a result, MPT suddenly had large market capitalization, and Yoshimoto

23   needed to decide how to use the borrowing ability that the market cap created to expand.

24   (Schlichtmann Decl., Exh. B at 91:25-92:5; Exh. C at 45:17-46:7.)  At the time, MPT was a

25   significant presence in its industry in Japan and was making inroads into China, but was largely

26   unknown outside those countries.  (Schlichtmann Decl., Exh. B at 86:12-20, 123:16-21.)

27          Through Mika Saitoh – whom Yoshimoto had known for years as the regional director

28   (Asia/Pacific) of MPT vendor Kasenna, Inc. – Yoshimoto learned that Robert Creager, who had

⊗
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  founded MPT rival MagiNet, was back in the United States and looking for a new business

2  venture. (Schlichtmann Decl., Exh. B at 80:3-16; Exh. A at 21:7-24.) Yoshimoto took Saitoh up

3  on her suggestion that the two men consider working together on MPT's expansion, and invited

4  Creager to meet with him in Tokyo in May 2004. (Schlichtmann Decl., Exh. B, 82:6-22; Exh. A,

5  21:25-22:5.)

6                  **2.      Creager and Yoshimoto Meet, Reach Initial "Hand-Shake
                          Agreement," Then Firm It Up in Writing as July 2004 Memorandum
7                           of Understanding**

8          At their first meeting, Creager proposed that it made better sense to emphasize growth by

9  acquisition, rather than relying on expanding demand for MPT's services one hotel at a time as

10  Yoshimoto had initially contemplated. (Schlichtmann Decl., Exh. B, 85:6-17, 91:6-92:9, 92:17-

11  21.) Yoshimoto agreed with this concept, and he and Yoshimoto reached a "handshake

12  agreement." (Schlichtmann Decl., Exh. B, 86:12-20, 88:11-17, 95:6-9.)

13         The terms of this initial oral agreement were still somewhat vague as of May 2004:

14  Creager would set up a company in California to help MPT expand outside Japan and China, and

15  Yoshimoto would see to it that the new company received half a million dollars to cover its first

16  six months of operation. (Schlichtmann Decl., Exh. B, 86:12-25, 87:6-20.) Yoshimoto came up

17  with the name for the new company: AMG MediaVision, Inc., or "AMG" for short.

18  (Schlichtmann Decl., Exh. A, 26:19-27:3.) Creager's exact salary was left approximate, and

19  there was at the time only a general agreement that he would also receive stock and stock

20  options, with no discussion of the amount. (Schlichtmann Decl., Exh. B, 88:21-91:5, 93:2-19.)

21  The men agreed to work out the terms in greater detail and put them in writing at their next

22  meeting, which was to be in Australia. (Schlichtmann Decl., Exh. B, 86:12-87:5, 97:15-20.)

23         Creager was concerned about getting a more concrete agreement on the terms of his

24  engagement and putting the terms in writing before he would devote more time, his industry

25  knowledge and connections, his business talents, and hours of worldwide business travel to

26  MPT. (Schlichtmann Decl., Exh. B, 105:8-15, 114:3-7; Exh. A, Exh. 82.) His insistence

27  stemmed in part from his then-recent bitter experience with the team to whom he had sold

28  MagiNet, and the court action he had had to file against them to enforce the terms of his written

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION**, Case No. C05-01985 JSW                    2

1  severance agreement with them. (Schlichtmann Decl., Exh. B, 265:5-13; Exh. C 258:25-261:23.)

2  He was not about to rely on an oral agreement for such a major commitment. (Schlichtmann

3  Decl., Exh. D, Exh. 95; Exh. B, 265:5-13, 271:25-272:6.)

4      Thus, in June 2004, Creager and Yoshimoto exchanged e-mails in which Yoshimoto

5  described what he wanted AMG to do for MPT, and Creager made "clear" that he would not

6  continue to "provide [MPT] with my time, advice and contacts free of charge," and needed an

7  indication of MPT's own interest and commitment to working with him. (Schlichtmann Decl.,

8  Exh. A, Exh. 82.)[1/] Creager suggested, as an alternative to the company framework that

9  Yoshimoto had talked about in Tokyo, a regular consulting contract; but Yoshimoto remained

10  firm that he wanted the company AMG to be set up, instead. (*Id.*; Exh. B, 135:17-137:23.)

11      The Melbourne meeting ultimately took place in July 2004, stretching over a few days.

12  (Schlichtmann Decl., Exh. B, 100:4-6.) On their first day there, over a period of hours, the two

13  men discussed in greater detail the terms of Creager's agreement to help MPT; they continued

14  and concluded their negotiations the following day. (Schlichtmann Decl., Exh. B, 112:3-113: 6.)

15  Creager had brought his laptop, so he undertook to reduce the discussions to writing.

16  (Schlichtmann Decl., Exh. B, 99:20-22, 101:18-22, 111:1-8.) He went through more than a

17  dozen drafts of the terms of their agreement, which Yoshimoto reviewed and in which he made

18  changes, before Creager entered the written version of the agreement.[2/] (Schlichtmann Decl.,

19  Exh. B, 106:16-25, 109:19-110:17; 112:3-113:6.) At his deposition, Yoshimoto admitted

20  making changes to the terms Creager entered. (Schlichtmann Decl., Exh. A, 38:8-18.)

21      Two related changes that Yoshimoto had Creager incorporate in the MOU in Melbourne

22  were (1) to switch the source of AMG's initial funding source from MPT to M2M and (2) to

23

24  [1]  In addition, between the meetings in Tokyo and Australia, Creager demonstrated his seriousness to Yoshimoto about the time having arrived for reciprocal commitments by cancelling a trip to a New Orleans trade show, and postponing the trip to Australia, after Yoshimoto failed to send the expense money ahead of time as he had previously agreed. (Schlichtmann Decl., Exh. B, 115:7-116:17, 117:23-118:5.)

25

26

27  [2]  Defendants previously insisted that Creager had brought a fully formed agreement to Australia from San Francisco and presented it to Yoshimoto. However, the electronic "metadata" of the drafting of the MOU conclusively establish that the first draft of the MOU was entered on July 10, 2004 – when Creager was already in Australia, meeting with Yoshimoto. (See Creager Decl., Exh. B.)

28


LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION**, Case No. C05-01985 JSW          3

1   switch the signator from himself for MPT to himself personally. (Schlichtmann Decl., Exh. B,

2   138:7-12.) Yoshimoto explained to Creager that it was his practice to use M2M, his personal

3   investment company, to get ventures started for MPT that would be harder for a Japanese public

4   company (like MPT) to do. (Schlichtmann Decl., Exh. B, 119:18-120:11, 138:7-12.) He

5   described to Creager, as an example, the way he had brought Edge Networks of San Jose into the

6   MPT corporate family: M2M had originally provided funding, and then Edge became part of an

7   MPT joint venture with Shanghai University. (Schlichtmann Decl., Exh. B 119:24-120:7.)[3]

8   From this discussion and knowing Mr. Yoshimoto's role as the founder and chairman of, and

9   large shareholder in, MPT, as well as its CEO, Creager understood that although MPT was not

10  formally a party to the MOU, Yoshimoto could get MPT to meet the role set out for it in the

11  MOU. (Schlichtmann Decl., Exh. B 138:20-139:1.)

12      Ultimately, Yoshimoto and Creager reached agreement on and signed the agreement,

13  titled "Memorandum of Understanding" ("MOU"), just over two pages long. (Schlichtmann

14  Decl., Exh. B, 102:5-9, 107:10-23; Exh. A, Exh. 83.)

15              **3.    Key Terms of the July 2004 MOU**

16      The MOU provided for Creager to create a San Francisco-based company, to be called

17  AMG MediaVision, Inc. ("AMG"), which Creager would operate for the benefit of MPT.

18  (Schlichtmann Decl., Exh. B, 105:16-25.) AMG would be funded for its first six months by

19  Yoshimoto and his private investment company, M2M, Inc. ("M2M"). (Schlichtmann Decl.,

20  Exh. B, 119:22-120:2, 120:12-15.) The MOU defined the relationship among Yoshimoto, MPT,

21  and Creager, set business goals for AMG, and established a compensation plan for Creager and

22  future AMG employees. (Schlichtmann Decl., Exh. B, 120:20-121:8, 122:2-5.)

23      Under the MOU, M2M was to provide an initial half-year infusion of $500,000 to set up

24  and operate AMG for the benefit of MPT and its corporate affiliates. (Schlichtmann Decl., Exh.

25  B, 104:10-16; Exh. C, 232:3-10.) AMG's near-term mission included identifying potential

26

27  [3]  At his deposition, Yoshimoto testified to a number of other companies that he had
    brought together with MPT and provided funding to via M2M, for such purposes as
    ensuring that a vendor survived and MPT could avail itself of the technology that the
    vendor sold, or to foster a relationship with a company that handled MPT's leasing deals,
28  or for similar purposes to the benefit of MPT. (Schlichtmann Decl., Exh. A, 11:12-17:9.)


LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1   corporate candidates for MPT or a related entity to acquire so as to expand MPT's international

2   presence, and "managing" such acquisitions for MPT. (Schlichtmann Decl., Exh. B, 123:13-

3   125:1.) The MOU also contemplated that AMG would become a distributor of MPT

4   technologies, products, and services outside Japan and China. (Schlichtmann Decl., Exh. A,

5   28:15-21.) The parties' ultimate goal, as expressed in the MOU, was for AMG to issue an initial

6   public offering on the NASDAQ within three years. (Schlichtmann Decl., Exh. B, 137:14-17.)

7   However, AMG would start small, with its employees working out of their homes.

8   (Schlichtmann Decl., Exh. B, 104:10-24.) Creager was to be AMG's CEO. (*Id.*, 129:12-13.)

9       The MOU provided that, beyond the initial half-year funding from M2M, MPT would

10   supply future funding if AMG performed satisfactorily. (Schlichtmann Decl., Exh. A, Exh. 83.)

11   The MOU also established the measures of performance that would be satisfactory to MPT for

12   purposes of qualifying AMG to obtain such future funding:

13

14       8) AMG's performance shall be acceptable to MPT if by the end of 2004 AMG is
        in serious sales discussions with at least two potential major customers which are

15       not acquisition candidates OR is in serious acquisition discussions with at least
        one new acquisition candidate acceptable to MPT, or AMG's performance is

16       acceptable to MPT for other reasons satisfactory to MPT.

17   (Schlichtmann Decl., Exh. A, Exh. 83.)

18       The MOU also contained a paragraph defining the consideration that Creager was to

19   receive for his work on behalf of MPT:

20       10) Robert Creager will receive an employment agreement (with usual terms
        normal in Silicon Valley for experienced start-up CEOs) to be CEO of AMG with

21       an initial annual base salary of $300K, an annual performance-based bonus of
        50% of base salary, and an initial stock grant of 5% of AMG stock plus annual

22       option grants for the number of shares which, at a minimum, will offset dilution
        caused by any AMG financing rounds. In addition, at the closing of each

23       acquisition managed by AMG (whether the direct acquiror is AMG or MPT or a
        related entity) Robert Creager will receive 3% of the stock of the acquired

24       company plus a 10-year option to purchase an additional 2% of the acquisition
        price per share.

25

26   (Schlichtmann Decl., Exh. A, Exh. 83.)

27

28



LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

1         **4.     Yoshimoto Reconfirms the Parties' Intent in September 2004 E-Mail**

2       Even before AMG was launched, once Creager and Yoshimoto signed the MOU, Creager

3 was actively at work, looking for and checking out potential acquisition candidates for MPT.

4 (Schlichtmann Decl., Exh. B, 95:10-97:6; Exh. A, Exh. 83.)  In August 2004, he alerted

5 Yoshimoto to a new potential acquisition candidate that he had researched, Guest-Tek Interactive

6 Entertainment Ltd. ("Guest-Tek") of Canada.  (Schlichtmann Decl., Exh. A, Exh. 84.)  He was

7 eventually able to obtain MPT's commitment to seeking control of Guest-Tek, and played a vital

8 part in bringing off the deal, but initially the going was rough.  (Schlichtmann Decl., Exh. B,

9 153:10-155:9.)  In particular, MPT's second-in-command at the time, Ryuzo Nakazumi,

10 appeared concerned about protecting his turf within MPT, and made it difficult for Creager and

11 AMG to help MPT with the Guest-Tek acquisition.  (Schlichtmann Decl., Exh. B, 153:10-155:9;

12 *Id*. Exh. 61.)

13       As a result, by the end of September 2004, Creager was sending very carefully worded e-

14 mails to both Nakazumi and Yoshimoto.  (Schlichtmann Decl., Exh. B, 153:10-155:9; *Id.* Exh.

15 61.)  In some of these communications, Creager sought to placate Nakazumi.  (Schlichtmann

16 Decl., Exh. C, 99:18-100:6, 100:15-101:22; Exh. B, Exh. 65; Exh. C, Exh. 29.)  In others, he

17 alerted Yoshimoto to Nakazumi's obstructionism and sought confirmation that Yoshimoto still

18 meant for Creager to play the role agreed on in the MOU.  (Schlichtmann Decl., Exh. B, Exh. 61,

19 62.)  In an e-mail dated September 28, 2004, Yoshimoto reconfirmed the role that he and Creager

20 had agreed on when they negotiated and signed the MOU:

21         My clarification of AMG position as M&A

22         Finding support task
        1. Finding proper M&A target and candidate

23         2. Start discussions with target company and hear what status of company
        3. Introduce MPT position with key management and prepare next step

24         We say this is pre-sales.

25         After finding, M&A execution phase

26         1. AMG or yourself will be as support to MPT
        2. Main body of negotiation with target company, MPT and PWC and others will

27         make team to execute directly.
        Why I will not ask you involve this phase so much is, legal, financing,

28         arrangement for execution of M&A isnot main purpose of AMG . . . .

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S MP&A ISO OPPOSITION TO**
**DEFENDANTS' SUMMARY JUDGMENT MOTION,** Case No. C05-01985 JSW      6

1    But in order to get incentive for finding, MPT agree to give you and your staff
     warrant (Stock option) of target acquired company's stock as we discussed at IBC.

2

3    (Schlichtmann Decl., Exh. C, Exh. 31; Exh. A, 165:5-166:4.)

4         After this, the pace of Creager's and AMG's activity on behalf of MPT picked up,

5    particularly as the Guest-Tek effort swung into high gear.

6              **5.    Yoshimoto Admits He First Called the MOU a Mere "Wish List"
                       Only After This Lawsuit Was Filed, and That He Signed the MOU**
7              **Because He Knew Creager Insisted on a Written Agreement to Define
                       Both Sides' Roles**

8         Yoshimoto testified at his deposition that he regarded the MOU as merely Creager's

9

10   "wish list" or "minutes" of their discussions, not a binding agreement. (Schlichtmann Decl.,

     Exh. A, 39:9-25.) However, he later admitted that the first time he had used such terms to refer

11

     to the MOU was after Creager filed suit. (Schlichtmann Decl., Exh. A, 50:12-51:5, 51:17-52:2.)

12

     He had no recollection of telling Creager that the MOU was just a "wish list" or "minutes."

13

     (Schlichtmann Decl., Exh. A, 52:3-6.)

14

          Yoshimoto also testified that he signed the MOU because "[Creager] strongly requested

15

     it" and it was clear to him that it was important to Creager for purposes of "continu[ing]" their

16

     working relationship. (Schlichtmann Decl., Exh. A, 169:15-170:8.)

17
              **B.    Creager Exceeds the MOU's Performance Measures by Helping MPT and Its
18                    Subsidiaries Acquire Four Companies by Early 2005 – Turning MPT into a
                      World Leader in Its Industry**

19
                      **1.    Creager Identifies Guest-Tek and Helps MPT Acquire It**

20
          Creager first identified Guest-Tek, a publicly traded Canadian company listed on the

21

     Toronto exchange, to Yoshimoto as "a new potential acquisition opportunity that may be very

22

     interesting" in an August 2004 e-mail. (Schlichtmann Decl., Exh. A, Exh. 84.) When

23

     Yoshimoto expressed interest, Creager invited Guest-Tek's founder, board member, and then-

24

     former CEO, Arnon Levy, to travel with him to Japan, where Creager introduced Levy to

25

     Yoshimoto and helped begin negotiations. (Schlichtmann Decl., Exh. A, 70:6-9, 74:7-11, 75:7-

26

     10.) As the transaction progressed, Creager lent continued assistance in the negotiations and

27

     proved indispensable to the successful completion of this acquisition. As Mika Saitoh put it, "He

28   drove – it wouldn't have happened without him." (Schlichtmann Decl., Exh. C, 127:3-15.)

**PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION**, Case No. C05-01985 JSW                 7

1   Once acquisition discussions were underway, MPT ran into trouble setting up a Canadian

2   brokerage account to purchase shares on its behalf. (Schlichtmann Decl., Exh. B, 248:22-25.)

3   Foreseeing that ownership of extra shares in Guest-Tek would help MPT accumulate enough

4   shares to overcome opposing shareholder groups at the annual meeting, Creager personally

5   purchased stock in Guest-Tek. (Creager Decl.; Schlichtmann Decl., Exh. B, 248:2-21, 249:1-2.)

6   (He subsequently offered to resell the stock to MPT at the price he had paid.) (Creager Decl.;

7   Schlichtmann Decl., Exh. B, 254:4-255:24; MS 253:9-20, 256:8-25.) Since Guest-Tek had a

8   relatively small number of publicly traded shares, it was necessary to buy small amounts at a

9   time. (Schlichtmann Decl., Exh. B, 248:13-25.) Creager also played a vital role in overcoming

10  other crises that could have disrupted the acquisition. (Schlichtmann Decl., Exh. C, 127:14-15,

11  130:6-131:9, 132:4-15, 245:4-247:4.)

12      Mika Saitoh recalled specific examples of Creager's efforts:

13          . . . none of that would have happened had it not been for his active involvement.

14          . . . .

15          . . . they had to try to gain control without the opposition [to the then-former CEO,
            Arnon Levy] knowing about it and they had to do it in a surreptitious way such
16          that it wasn't seen that large blocks of stock were being sold, which would drive
            up the share of the stock price, the unit price. And it was Bob who was working
17          with Kate Eaton of Wolverton Securities in Calgary to try to see which investor
            would sell, which – who might not sell.
18              He was the conduit through which a lot of the communication happened
            between the then deposed CEO, Arnon Levy, who we introduced to
19          Mr. Yoshimoto for the first time. And there was a lot of cultural idiosyncrasies
            specific to dealing with the Japanese that Arnon was ignorant about. And at the
20          same time Mr. Yoshimoto, as much business as he had conducted with U.S.
            partners and vendors, he had never been part of a multicultural – multinational,
21          excuse me, organization himself. So it was financial, legal, and cultural issues
            that Bob interpreted and facilitated.
22              He worked directly with – I mean, he got the agreement – he spearheaded
            the agreement that resulted in the purchase of Guest-Tek. He would be on the
23          phone explaining to somebody in Japan, Mr. Yoshimoto or Mr. Nakazumi, the
            meaning of clause number 13, and this is not uncommon, please don't be worried
24          about this clause. This is standard legal boilerplate. He – he was instrumental in
            getting this deal done.

25

26  (Schlichtmann Decl., Exh. C, 127:14-15, 130:6-131:9; see also 132:4-15, 245:4-247:4.)

27      As part of the understanding reached between Levy and Yoshimoto, MPT secured

28  effective control over Guest-Tek prior to its formal acquisition of a controlling percentage of


LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION, Case No. C05-01985 JSW          8

1  shares, by arranging for Creager to be appointed to the Guest-Tek board as MPT's representative.
2  (Schlichtmann Decl., Exh. B, 250:17-251:11; Exh. A, 74:17-75:6, 86:11-22.) Yoshimoto had
3  him added to the Guest-Tek board specifically to represent MPT's interests. (*Id.*, Exh. A, 74:17-
4  75:6, 83:17-25, 86:13-16.)

5  MPT completed the acquisition of Guest-Tek in early 2005. (Schlichtmann Decl., Exh.
6  E.) Once Guest-Tek became an MPT company, Creager worked actively with Guest-Tek to help
7  make MPT's successive rounds of financing possible, and also assisted Guest-Tek's
8  management. (Schlichtmann Decl., Exh. A, 74:10-75:17, 84:13-21.) He introduced Guest-Tek's
9  top management to important industry contacts in the United States and Europe. (Creager Decl.)
10 These contacts included potential customers, distributors, merger prospects, and acquisition
11 targets. [*Id.*]

12  **2.    Creager's Role in Guest-Tek's Acquisition of Golden Tree**

13  Guest-Tek's infusion of MPT cash enabled Guest-Tek to acquire another firm: Golden
14 Tree, of California. (Creager Decl.; Schlichtmann Decl., Exh. A, 164:10-165:1.) Creager
15 identified the target while working on Guest-Tek's board. (Creager Decl.) However, aware that
16 Guest-Tek had itself shown interest in acquiring Golden Tree and in the interest of fostering a
17 cooperative spirit between MPT and Guest-Tek, Creager persuaded MPT's executives to allow
18 Guest-Tek to acquire Golden Tree on its own. (Schlichtmann Decl., Exh. B, Exh. 119; Creager
19 Decl., Exh. C.)

20  Representing MPT, Creager participated in Guest-Tek's due diligence with Golden Tree.
21 (Schlichtmann Decl., Exh. B, Exh. 120; Creager Decl.)   The acquisition of Golden Tree closed
22 in March 2005. (Schlichtmann Decl., Exh. F.)

23  **3.    Creager Brings About MPT's Acquisition of LogicLink**

24  In December 2004, Creager identified LogicLink, Inc., as an attractive target for MPT.
25 (Creager Decl.)   Headquartered in Irvine, LogicLink established and managed 24-hour business
26 centers in North American hotel chains such as Hilton and Marriott. (*Id.*) During a joint visit
27 with Yoshimoto in Los Angeles, Creager organized a meeting involving Yoshimoto, LogicLink's
28 executives, and himself to discuss the possibility of an acquisition. (Schlichtmann Decl., Exh. B,

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION**, Case No. C05-01985 JSW                    9

1  184:5-21; Creager Decl.) After the meeting, Yoshimoto at first decided not to invest in

2  LogicLink. (Schlichtmann Decl., Exh. A, 107:4-19, 107:25-108:2; Creager Decl.) Continuing to

3  believe that LogicLink was an excellent investment for MPT, Creager pressed Yoshimoto to

4  change his mind. (Creager Decl.) Finally persuaded by Creager, MPT's leadership did in fact

5  reverse its decision, and began negotiations to acquire LogicLink. (Id.)

6      Throughout the acquisition process, Creager helped conduct due diligence with

7  LogicLink and with B. Riley & Co., LogicLink's investment advisor. (Id.) B. Riley listed

8  Creager as a "Buyer's Advisor" in its list of key deal contacts. (Id.) Creager helped Yoshimoto

9  negotiate the final price and arranged for the drafting of the final acquisition documents. (Id.)

10  The acquisition of LogicLink was closed in March 2005. (Schlichtmann Decl., Exh. E.)

11              **4.    Through Creager, MPT Acquires MagiNet**

12      Maginet's CEO, Nag Yong ("N.Y.") Lee, requested a meeting with Creager on Christmas

13  Day 2004 to discuss MagiNet's plan to conduct an IPO in 2005. (Schlichtmann Decl., Exh. D,

14  Exh. 90; Exh. C, 195:4-8.) The two met in San Francisco. (Schlichtmann Decl., Exh. D, 61:8-

15  13.) Creager was aware that Yoshimoto wanted MPT to rival or surpass MagiNet, and thought

16  that a private sale of Maginet might be more attractive to MagiNet's shareholders than an IPO.

17  (Schlichtmann Decl., Exh. D, 140:18-22.) So he broached an alternative possibility to Mr. Lee:

18  would MagiNet be interested in being acquired by MPT? (Id., 66:22-67:14, 73:13-74:3.) After

19  Mr. Lee expressed potential interest, Creager took up the matter with Yoshimoto. (Schlichtmann

20  Decl., Exh. A, 110:3-24.) MPT's leaders reacted with enthusiasm. (Id.)

21      Next, Creager arranged a meeting for MPT executives, MagiNet's leadership, and

22  himself, in Bangkok in early February 2005. (Schlichtmann Decl., Exh. B, 265:25-266:17.)

23  During this meeting, the participants conducted preliminary negotiations on the price and terms

24  of the acquisition, and Creager drafted the Letter of Intent to be executed between MPT and

25  MagiNet. (Schlichtmann Decl., Exh. A, 115:11-116:4.)

26      In late February 2005, Yoshimoto, the MagiNet leaders, and Creager met a second time.

27  (Id., 117:1-5.) At this meeting, the parties conducted final negotiations on price and terms, and

28  MPT and Maginet signed the Letter of Intent which Creager had drafted. (Id., 115:11-116:4,



LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S MP&A ISO OPPOSITION TO**
**DEFENDANTS' SUMMARY JUDGMENT MOTION**, Case No. C05-01985 JSW          10

1   117:1-5.)  In May 2005, MPT's acquisition of MagiNet was closed.  (Schlichtmann Decl., Exh.

2   E.)

3        Although Creager did not participate in the negotiations as to the sale price, in most other

4   respects he played an active role, comparable to the role he played regarding MPT's acquisition

5   of a controlling share of Guest-Tek and the return of Arnon Levy to the CEO position there.

6   (Schlichtmann Decl., Exh. C, 178:2-179:12.)

7        Thus, through Creager's successful efforts on its behalf, between September 2004 and

8   May 2005, MPT became a global leader in its industry.  For one measure, the number of hotel

9   rooms served by MPT grew by 300,000 after the Guest-Tek acquisition, and by another 129,000

10  after the Golden Tree acquisition.  (Schlichtmann Decl., Exhs. E, F.)  At the end of May after the

11  MagiNet acquisition was completed, MPT's hotel room count totaled at over 500,000 rooms.

12  (Schlichtmann Decl., Exh. E.)

13       **C.    As Creager Helps MPT Acquire More Subsidiaries, Uncertainty Emerges
             over AMG's Role in the Expanding MPT Family; Yoshimoto Pulls the Plug**

14

15       Ironically, Creager's very success helped to undermine AMG.  MPT's acquisition of

16  Guest-Tek, through Creager's efforts, gained MPT a beachhead in North America that was

17  already operational, instead of in start-up mode, and had its own technology that was better

18  adapted to the Western market.  (Schlichtmann Decl., Exh. C, 169:5-9.)  By taking over Guest-

19  Tek directly instead of through AMG – though that was authorized under the MOU – MPT had

20  started weakening AMG's independent potential.  (Schlichtmann Decl., Exh. B, 196:19-25.)

21  Furthermore, even as Creager succeeded in bringing in additional acquisitions for MPT, Guest-

22  Tek was beginning to successfully resist the original concept of Yoshimoto and the MOU that

23  AMG would market MPT's operational technology into new geographic areas.  (Schlichtmann

24  Decl., Exh. C, 173:4-11.)

25       The result was a period of uncertainty as to AMG's future as it approached the end of its

26  first six months and its initial half-year funding.  (*Id.*, 172:16-173:13 & Exh. 11; 174:13-176:14.)

27  Mika Saitoh experienced January and February 2005 in particular as a roller coaster of highs and

28  lows, as Creager enabled MPT to gain one subsidiary after another and both Yoshimoto and

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION**, Case No. C05-01985 JSW                    11

1  Nakazumi heaped praise on Creager and Saitoh for their effectiveness, only to advise Creager

2  shortly after that no further funding would be forthcoming.  (*Id.*, 163:16-164:6.)

3      Yoshimoto, Nakazumi, Creager, and Saitoh floated a succession of ideas for the creation

4  of a "new AMG" or some other vehicle for keeping Creager and the two AMG employees

5  working on behalf of MPT.  (Schlichtmann Decl., Exh. B, 226:8-11; Exh. C, 164:8-165:10;

6  167:25-169:1, 170:15-171:3, 189-8-190:17 & Exh. 40, 232:21-233:5.)  During this time period,

7  Creager offered to renegotiate his entitlements under the MOU; however, there was no response

8  to this offer.  (Schlichtmann Decl., Exh. B, 227:6-228:23; 231:1-25; 233:12-13.)

9      Ultimately, Yoshimoto decided that AMG would receive no further funding, and would

10  not "morph" into or merge with any new MPT affiliate.  (Schlichtmann Decl., Exh. A, Exh. 86.)

11  By e-mail dated March 2, 2005, he advised Creager of his decision:  AMG, due largely to

12  Creager, had "achieved" its "original purpose" and "[given] a new horizon to [Yoshimoto] and

13  MPT," but AMG would receive no further funding.  (*Id.*, 155:19-22, Exh. 86.)  AMG brought its

14  operations to an end.  (*Id.*)  Creager did not receive the remaining compensation, including the

15  stock equities, that he was due under the MOU.  (Creager Decl.)

16      **D.      MagiNet Contacts Creager About Paying Him the $1 Million Finder's Fee;**
**Yoshimoto Gives Written Approval for the Payment in Exchange for**
17  **Creager's Agreement to Invest in a New Southern California Venture, But**
**Yoshimoto Fails to Follow Up on the Venture**
18

19      On Christmas Day 2004, when Creager met with N.Y. Lee at the latter's request, N.Y.

20  Lee said to Creager that MagiNet would pay Creager a finder's fee if MPT bought a controlling

21  share of MagiNet. (Schlichtmann Decl., Exh. B, 259:23-260:10; Exh. C, 195:23-196:5, 199:23-

22  200:3.)  Because of Creager's strained relations with the MagiNet leadership and the fact that the

23  Lees and MagiNet were still making installment payments to him in settlement of his lawsuit

24  against them, Creager attached no credence to the comment – he took it as a joke of sorts.

25  (Schlichtmann Decl., Exh. B, 264:8-15, 265:5-13, 271:25-272:6; Exh. C, 257:21-25; 258:25-

26  261:23.)  Mika Saitoh recalled Creager's bemused tone as he recounted the discussion to her on

27  returning home.  (Schlichtmann Decl., Exh. C, 194:25-195:12.)

28      Once Creager received MPT's go-ahead to set up an exploratory meeting with the Lees of

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION, Case No. C05-01985 JSW        12

1    MagiNet, he and N.Y. Lee exchanged a series of logistical e-mails that led to the initial meeting

2    in Bangkok in early February 2005. (Schlichtmann Decl., Exh. D, Exhs. 92, 94, 95; Exh. B,

3    260:11-15, 265:25-266:7.) As these e-mails show, it was again Lee who initiated

4    communications about a finder's fee. (*Id.*) Creager responded by doubling Lee's "proposal" in

5    the course of providing logistical information; he still did not take the matter as a serious offer, in

6    view of his history with the Lees. (Schlichtmann Decl., Exh. D, Exh. 95; Exh. B 265:5-13,

7    271:25-272:6.) At the first meeting, Lee and Creager encountered each other in a hallway and

8    Lee made a "counteroffer." (Schlichtmann Decl., Exh. B, 265:14-24.) At this point, Creager

9    made a point of telling Lee that he could not "help" them on the price; Lee shrugged and walked

10    on. (*Id.*)

11       Creager heard nothing more about the matter until late April or early May 2005, when he

12    received a call from Harri Makela, a MagiNet manager whom Creager knew from his early years

13    with MagiNet. (Schlichtmann Decl., Exh. B, 270:9-25.) Makela started the call by

14    "congratulating" Creager, and advised him that MPT's deal with MagiNet would shortly go

15    through and contained a line item for $1 million to be paid to Creager by the MagiNet sellers.

16    (*Id.* at 9-25.) By now, Yoshimoto had severed relations with AMG and failed to provide the

17    remaining compensation due Creager under the MOU. (Creager Decl.) Creager could do

18    nothing to secure the funding; he would have to wait and see if any of the money actually came

19    through. (Schlichtmann Decl., Exh. B, 271:1-5.)

20       At some point, Yoshimoto became aware of the item. (Schlichtmann Decl., Exh. B,

21    271:20-272:6.) He came to San Francisco in May 2005 and tried to link approval of the payment

22    to Creager's dropping of this lawsuit. (Schlichtmann Decl., Exh. B, 274:18-276:2.) When

23    Creager refused, Yoshimoto then sent him an e-mail making approval of the payment conditional

24    on Creager's agreeing to join him in a new business venture that Yoshimoto was contemplating

25    in Southern California. (Schlichtmann Decl., Exh. B, Exh. 114, 273:21-274:13, 276:8-277:20.)

26    Creager agreed by return e-mail, and Yoshimoto e-mailed his assent to the payment. (*Id.*) They

27    then traveled to Southern California to scout the concept. (*Id.*) However, Creager found the

28    concept not well thought through; he sent Yoshimoto an extended analysis about the problems he



LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION**, Case No. C05-01985 JSW     13

1 perceived, and invited Yoshimoto's response. (*Id.*) He never heard anything more from
2 Yoshimoto about the proposed business venture, but did receive the MagiNet payment. (*Id.*)

3 The above summary of relevant events, while highly abbreviated, shows clearly how
4 incomplete and distorted Defendants' version of the facts is. Defendants compound this
5 deficiency in their legal arguments, as discussed below.

6 **III.     STANDARD OF REVIEW**

7 Summary judgment is proper only where "the pleadings, depositions, answers to
8 interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
9 genuine issue as to any material fact and that the moving party is entitled to judgment as a matter
10 of law." Fed. R. Civ. P. 56(c). Because summary judgment is a "drastic device" cutting off a
11 party's right to present its case to a jury, the moving party bears a "heavy burden" of establishing
12 the absence of any triable issue of material fact. *Nationwide Life Ins. Co. v. Bankers Leasing*
13 *Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999).

14 Substantive law governs the materiality of facts, and only facts that affect the outcome of
15 the matter the motion raises are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
16 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. A genuine issue
17 of material fact exists where there is sufficient evidence for a reasonable fact finder to find for
18 the non-moving party. *Id.* at 248-49.

19 The moving party bears the initial burden of demonstrating the absence of a genuine issue
20 of material fact, and in that connection must identify the pertinent portions of the pleadings,
21 discovery, and affidavits. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving
22 party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no
23 reasonable trier of fact could find other than for the moving party.

24 In judging evidence at the summary judgment stage, the Court does not make credibility
25 determinations or weigh conflicting evidence; instead, it draws all inferences in the light most
26 favorable to the nonmoving party. *See T.W. Elec. Service,* 809 F.2d 626, 630-31 (9th Cir. 1987)
27 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)); *see also*

28



LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION, Case No. C05-01985 JSW                    14

1  *Ting v. United States,* 927 F.2d 1504, 1509 (9th Cir. 1991) (on summary judgment, court views

2  evidence in light most favorable to party opposing motion).

3  **IV.    LEGAL ARGUMENT**

4      **A.    The July 2004 MOU Signed by Creager and Yoshimoto Is a Contract
Enforceable Against Both Yoshimoto and MPT**

6      Defendants persist in characterizing the July 2004 as a mere "agreement to agree," not a

7  binding agreement.  This argument is without merit on the facts of this case.

8      First, California courts have repeatedly upheld the legal status of a memorandum of

9  understanding as a binding agreement.  *See, e.g., Glendale City Employees' Association, Inc. v.*

10  *City of Glendale*, 15 Cal. 3d 328, 338 (1975) (MOU upheld as "indubitably binding"); *National*

11  *City Police Officers' Association v. City of National City,* 87 Cal. App. 4th 1274, 1280 (2001)

12  ("[t]he cases make it clear [that] interpretation of an MOU, like the interpretation of any other

13  written instrument, is a matter for courts to resolve by attempting to discern the parties' intent

14  from the fact of the MOU and if need be, any extrinsic evidence offered by the parties").

15      In addition, as summarized above (Section II.A. 2 - 4), the history of the parties' e-mail

16  communications both before and after they met in Melbourne in July 2004; the multiple number

17  of drafts prepared exclusively during the course of the two-day negotiations between Creager and

18  Yoshimoto; and Yoshimoto's admissions that he made changes in the MOU before signing, and

19  signed because he understood that it was important for purposes of continuing Creager's

20  beneficial working relationship with him and MPT – together, all this evidence makes it

21  impossible to find as a matter of law that the MOU is not an enforceable contract.[4/]

22      Valuable consideration was committed on both sides, after extended negotiations between

23  an attorney and a sophisticated, successful international businessman.  Valuable consideration

25  [4]   Defendants' contention that a February 2005 e-mail sent by Creager to MPT's Nakazumi,
which suggested the payment of consulting fees to <u>AMG</u>, "makes no sense if Creager

26  thought <u>he</u> was entitled to equity compensation under paragraph 10" (Def. Brief at 13:10-
19 (emphasis added)), obviously ignores the distinction between funding for the company

27  and equity compensation to Creager as an individual.  By February 2005, Creager was
looking out for AMG's continued funding and for the livelihoods of its other two

28  employees.  This was a separate matter from his entitlement to stock compensation for the
acquisitions he had brought about for MPT.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION**, Case No. C05-01985 JSW      15

1  was in fact thereafter delivered by both sides for a number of months – except that Yoshimoto

2  and MPT eventually withheld a major portion of the consideration that Creager was due under

3  paragraph 10 of the MOU.

4      Defendants' assertion that the Yoshimoto and Creager "never reached agreement about

5  equity compensation to Creager relating to acquisitions by MPT" (Def. Brief at 4:16-17) is belied

6  by the plain language of the second sentence of paragraph 10 (quoted above, p. 5), as well as by

7  the history of the formation of the MOU. Likewise, Defendants' contention that the stock and

8  stock options provided for in paragraph 10 of the MOU were to be provided only "in an

9  employment agreement" at some future time disregards the structure of paragraph 10, which is

10  why the paragraph is quoted in full above. The entitlement to a specified measure of stock and

11  stock options, upon performance, is defined in a sentence completely separated from the sentence

12  describing employment compensation terms to be finalized in the employment agreement. (See

13  sec. II.A.3.)

14      Though MPT was not a signatory of the MOU, Creager had good reason to understand

15  that Yoshimoto was empowered as its agent to bind MPT to follow through on the equity

16  compensation promised in paragraph 10. First, as Creager testified, "Mr. Yoshimoto was the

17  founder and chairman and 30 percent shareholder of MPT. So I believed that he had the ability

18  to get [MPT] to perform." (Schlichtmann Decl., Exh. B, 138:24-139:1.) Moreover, Yoshimoto

19  had explained to Creager that it was his practice to use M2M to get ventures started for MPT,

20  because using M2M for this purpose afforded greater flexibility than MPT, as a public company,

21  could offer, and that he had done just such a thing with Edge Network. (*Id.*, 119:22-120:11.)

22  Beyond all this, MPT and its top executives ratified the MOU by following through on the

23  working relationship that the MOU established and by accepting the substantial benefits of

24  Creager's performance. (See, for example, Saitoh testimony regarding Guest-Tek acquisition, as

25  quoted above at section II.B.1.)

26      Finally, Defendants' assertion that Creager never asked Yoshimoto to pay him the equity

27  compensation, and their argument that Creager "waived," both play fast and loose with the

28  evidence. The former disregards both the speed at which acquisitions were being agreed to and

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION,** Case No. C05-01985 JSW                16

1   the time it took to close them: in several cases, the acquisition was not finalized until well after

2   Yoshimoto terminated the relationship with Creager and AMG, so the equity literally was not yet

3   owing while Creager and AMG were still part of the MPT community.

4       Moreover, this assertion appears to deliberately confuse oral and written communications.

5   Only two pages after quoting a February 2005 e-mail in which Creager plainly declares his

6   entitlement to stock and options relating to the Guest-Tek and LogicLink deals (Def. Brief at

7   12:18-20), Defendants cavil that the only time Creager "told" Yoshimoto he was entitled to

8   "anything" under the MOU was in a phone call after Yoshimoto terminated further funding for

9   AMG (*id.* at 14:10-12). By the February e-mail, Creager "told" Yoshimoto in no uncertain terms

10  of his entitlement; and as he pointed out in his testimony, there would have been no reason to

11  express this much earlier, since the various acquisitions were just coming on line around that

12  time.

13      The "waiver" argument relies on the trick of quoting a fragment of a sentence of

14  Creager's February 19, 2004, e-mail to Yoshimoto out of context. The relevant portion reads as

15  follows:

16      . . . According to our agreement, I should receive stock and stock options in
    Guest-tek and LogicLink. Please note that I do not insist on our original
17      agreement, but I do insist that we now agree on a fair settlement for those two
    deals and a new agreement for future deals. . . .
18

19  (Schlichtmann Decl., Exh. B, Exh. 81, 227:13-18.) Defendants quote only the first clause of the

20  "Please" sentence, and assert, with no supporting authority, that this truncated fragment

21  constitutes "emphatic disavowal" of Creager's rights to stock and stock options, and therefore

22  amounts to waiver. Defendants ignore his straightforward testimony that the full sentence

23  represented his offer, as a "team player," to "renegotiate the original agreement," an offer that he

24  was willing to make only before AMG was "terminated" – and an offer that Yoshimoto and MPT

25  never accepted. (*Id.*, 228:10-23, 231:1-11, 233:12-13.) Since they failed to accept Creager's

26  offer to renegotiate, the MOU's equity provisions were never modified.

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  Plainly, Creager never waived his rights to stock and stock options under the MOU. Just
2  as plainly, summary judgment should be denied – to all three Defendants – on Creager's
3  summary judgment claim.

4  **B.** **Defendants' Attack on Creager's Claim for Breach of the Covenant of Good
   Faith and Fair Dealing Relies on Inapposite Authorities**

6  Defendants cite a number of inapposite authorities in their attack on Creager's claim for
7  breach of the covenant of good faith and fair dealing. *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317
8  (2000), was a wrongful employment termination case in which the California Supreme Court
9  reasoned that the plaintiff could not rely on a breach of the covenant claim to challenge his
10 dismissal as arbitrary if his employment was in fact at will; and if his employment was not at
11 will, he could challenge the termination directly in a contract action, instead of attacking asserted
12 arbitrariness. *Id.* at 350. Defendants also imply that Creager may hope to recover tort damages
13 for this claim – an unfounded suggestion. (See Def. Brief at 16:4-8.)

14 The MOU provided for several categories of compensation. It also provided for the
15 continued operation and funding of AMG if Creager and AMG met performance criteria
16 specified in paragraph 8. They did so, yet Yoshimoto and MPT prevented them from obtaining
17 further funding, denying Creager yet another set of the benefits of the MOU. The promise of
18 good faith and fair dealing, implied by law in every contract, is intended to prevent a party from
19 unfairly interfering with the right of any other party to receive the benefits of the contract. *E.g.,*
20 *Hicks v. E.T. Legg & Assocs.*, 89 Cal. App. 4th 496, 508-509 (2001). It is not superfluous in this
21 situation.

22 The question of whether an implied covenant of good faith and fair dealing his been
23 breached is a question of fact, unless only one inference is possible from the evidence. *Id.* at 509.
24 Defendants have made no such showing, and their attack on the legal basis for this claim is
25 without merit. Therefore, summary judgment should not be granted as to this claim.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION**, Case No. C05-01985 JSW      18

1    **C.    Masuo Yoshimoto's Testimony Supplies Evidence of His Intent to Mislead
         Creager in Signing the MOU, and Defendants' Claim of "No Damage" Is
2        Millions of Dollars Off the Mark; Summary Judgment Should Be Denied on
         Creager's Fraud Claim**

3

4             **1.    Yoshimoto's Testimony Supplies Evidence of Fraudulent Intent**

5             Defendants contend that Creager is unable to maintain his fraud claim because he lacks

6    evidence of Yoshimoto's (or any other individual's) intent to mislead him. Defendants' assertion

7    that, "at his deposition, Creager could not point to specific facts" suggesting any Defendant's

8    intent to mislead him mischaracterizes the cited testimony, ignores other Creager testimony, and

9    overlooks Yoshimoto's own testimony.

10            Creager's testimony at pages 289:10-290:19 of his deposition referred to several pieces of

11   circumstantial evidence from which it could be possible to reconstruct fraudulent intent on the

12   part of both Mr. Yoshimoto and Mr. Nakazumi, as well as stated that there were "lots of

13   examples" of such evidence. (Schlichtmann Decl., Exh. B, 289:10-290:19.) Moreover, while

14   counsel chose to ignore it, Creager had only moments earlier pointed to Mr. Yoshimoto's actions

15   as indicating, in hindsight, an intent not to sign the AMG corporate documents; Creager also

16   testified that he read Mr. Yoshimoto's testimony as indicating that neither he nor Mr. Nakazumi

17   ever intended for AMG to operate for more than half a year. (*Id.* at 286:25-288:5.)

18            Mr. Yoshimoto's testimony provided strong evidence of fraudulent intent. He admitted

19   having negotiated the MOU and obtained certain changes in it before signing. (Schlichtmann

20   Decl., Exh. A, 38:8-18.) Yet he also testified that he regarded the MOU as merely Creager's

21   "wish list" or "minutes" of their discussions, rather than a binding agreement – and he admitted

22   that he never indicated this to Creager. (*Id.*, 39:9-25, 50:13-51:5, 51:17-52:6.) Further,

23   Yoshimoto testified that he signed the MOU because it was clear to him that doing so was

24   important to Creager for purposes of continuing their working relationship – a working

25   relationship so beneficial to Yoshimoto and MPT. (*Id.*, 169:15-170:8.) A jury could readily find

26   this testimony of intent to mislead Creager and intent to induce Creager's reliance to his financial

27   detriment, key elements of a fraud claim. Therefore, it would be inappropriate to grant on

28   Creager's fraud claim.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1

2.    **Defendants' "No Damages" Argument Ignores the Terms of the MOU**

2        Defendants argue that because he received <u>some</u> money under the terms in the MOU, as

3    well as the MagiNet finder's fee, Creager has suffered no damages.  This is both illogical and

4    contrary to the terms of the MOU.

5        Indeed, Defendants' math is off by half as to Creager's claims.  As quoted earlier,

6    paragraph 10 of the MOU provides for Creager to be awarded "<u>3% of the stock of the acquired</u>

7    <u>company</u>" – <u>not</u> 3% of the value of the <u>portion</u> of stock that MPT or a subsidiary acquired – at

8    the closing of each such acquisition.  Thus, Defendants' statement that Creager claims ownership

9    of 3% of the sum of the purchase prices that MPT or Guest-Tek actually paid ($117.5 million as

10    to three companies, not including Golden Tree) woefully understates the amount at stake, since

11    MPT actually purchased only a portion (albeit a controlling portion) of the shares of the

12    companies in question.  The 3% factor applies to a total closer to $200 million.

13        Thus, clearly, even a $1 million finder's fee does not offset Creager's damages.

14    D.    **Summary Judgment Is Inappropriate on Creager's "Section 17200" Claim,**
        **in Part Because He Has Viable Fraud Claims Under Sections 1709 and 1710**
15        **of the California Civil Code**

16        The evidence of fraudulent intent on Yoshimoto's part already in the record not only

17    establishes key elements of a claim for common law fraud:  it also is relevant to satisfying the

18    elements of California's companion fraud statutes, sections 1709 and 1710 of the Civil Code.

19    (For example, actionable deceit includes "[a] promise, made without any intention of performing

20    it" (Cal. Civ. Code § 1710(4)) – that is, the kind of promise that Yoshimoto made in signing the

21    MOU.)

22        As a result, even under the most conservative interpretations of the "unlawful" and

23    "unfair" prongs[5/] of a claim under section 17200 of the California Business and Professions Code

24    – a so-called "unfair competition" or "Section 17200" claim – Creager can maintain his claim.

25

26

27

28

---

[5]        See Def. Brief at 19:7-18, 19:24-20:13 for Defendants' examples.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION, Case No. C05-01985 JSW        20

1    **1.    Defendants' Argument That the Section 17200 Claim Fails Because
           Creager "Actually" Seeks Damages Instead of Restitution Ignores the
2          Complaint and Relies on Inapt Law**

3    Defendants misrepresent to the Court that Plaintiff seeks only damages.  (Def. Brief at

4    21:9-10.)  Later, they admit that Creager's section 17200 claim seeks restitution (as does the

5    prayer for relief, though Defendants ignore this), but insist that what Creager really seeks is

6    damages, and a mere "expectancy" at that.  (*Id.* at 21:24-22:1.)

7    Defendants' reliance on *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134

8    (2003) is misplaced.  *Korea Supply* concerned a situation where one business contended that a

9    competitor had prevented it from obtaining a lucrative contract with a foreign government.  *Id.* at

10   1140.  The Court held that the plaintiff business could not maintain a Section 17200 claim in

11   those circumstances, because it did not have a vested interest in the money it sought and any

12   award granted it against defendant would not replace money that defendant had taken directly

13   from it.

14   No such triangulated situation is involved here.  Furthermore, Creager has a vested

15   interest in the stock and stock options -- vested by virtue of his performance -- rather than a "mere

16   expectancy."  Thus, the appropriate authority in this instance is *Cortez v. Purolator Air Filtration

17   Products Co.*, 23 Cal.4th 163 (2000), in which the California Supreme Court held that back

18   wages did constitute a form of vested property interest that could be "restored" to plaintiffs to

19   remedy improper withholding by an employer who had failed to pay overtime wages.  *Id.* at 178.

20   Consequently, the Court should reject Defendants' argument that Creager's Section

21   17200 claim should be dismissed as "actually" involving a damages claim.

22   **E.    The Unjust Enrichment Claim Should Not Be Summarily Adjudicated**

23   Defendants also attack Creager's unjust enrichment claim on grounds that he really seeks

24   damages, not restitution.  As discussed above, this is incorrect.  Moreover, this claim is

25   particularly significant with respect to MPT, in the unlikely event that the factfinder were

26   ultimately to determine that MPT was not bound by the MOU but did substantially benefit

27   through Creager's services as the result of a wrongful act.  *See Calistoga Civic Club v. City of

28   Calistoga*, 143 Cal. App. 3d 111, 116 (1983) (wrongful act giving rise to constructive trust need

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION, Case No. C05-01985 JSW          21

1  not rise to level of intentional misrepresentation; all that need be shown is that acquisition of the

2  property was wrongful and that keeping of the property by defendant would constitute unjust

3  enrichment).

4      Accordingly, the Court should reject Defendants' arguments for summary judgment as to

5  this claim.

6      ### F.   **Defendants' "Unclean Hands" Argument Relies on Disputed Facts**

7      Defendants' "unclean hands" argument cites authority only for the basic principle that

8  unclean hands may "close[] the doors of a court of equity." Defendants cite no authority for the

9  propositions that their factual accounts amount to either breach of fiduciary duty or insider

10  trading.

11     Furthermore, the factual account that Defendants assert is disputed. Creager has denied

12  under oath that he believed that M.Y. Lee really meant to pay him a "finder's fee." His suspicion

13  is corroborated by Mika Saitoh's account of how strained relations were between the Lees and

14  Creager (see Schlichtmann Decl., Exh. C, 257:21-25; 258:25-261:23), as well as by the fact that

15  all the initiative and all the control over this matter were on Defendants' side, not Creager's.

16     Similarly, Creager denies that he ever had a handshake deal with Yoshimoto to dismiss

17  this lawsuit in order to be paid the finder's fee. Indeed, Yoshimoto's own e-mail in mid-May

18  2005, making payment of the finder's fee conditional on Creager's agreeing to join in a venture

19  in Southern California, discredits the "handshake" story.

20     As for the Guest-Tek shares, Creager and Saitoh have both testified that Creager's

21  purchases in the summer of 2004 served the purpose of enabling MPT to gain control of Guest-

22  Tek. Furthermore, there is evidence that Creager offered, to Yoshimoto, to sell his shares to

23  Guest-Tek at the price he had paid for them, but received no response, and eventually withdrew

24  the offer after Yoshimoto cut off further funding for AMG. He has sold one lot at a loss, and is

25  holding onto another set of shares with a present trading price well below what he paid for them.

26  None of this evidence supports the allegation of unclean hands, and none serves as a basis for

27  summarily adjudicating any of Plaintiff's claims.

28


LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1    **G.    Summary Judgment Should Not Be Granted as to the Common Counts
            Claim, Since Portions of Creager's Claim for Relief Are a Fixed Sum and
2            Others Can Readily Be Reduced to a Sum of Money**

3        There are several components to Creager's claim for relief, including the $12,500 balance

4    of his $50,000 signing bonus. Furthermore, the 3% stock to which Creager is entitled under the

5    MOU can be readily valued: the shares are to be valued at the price they were trading at on the

6    date of acquisition, and the 3% factor applies to all shares, not just the portion acquired by MPT

7    or Guest-Tek. Thus, summary judgment should be denied on this claim.

8    **V.    CONCLUSION**

9        For the reasons discussed above, Plaintiff Robert Creager respectfully submits that the

10   Court should deny Defendants' motion for summary judgment in its entirety.

11

12   Dated: July 13, 2007                        COTCHETT, PITRE & McCARTHY

13

14                                               By: _____/s/_____
                                                        LAURA SCHLICHTMANN
15                                               Attorneys for Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

PLAINTIFF'S MP&A ISO OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MOTION, Case No. C05-01985 JSW                    23