SCHIFF HARDIN LLP
Robert B. Mullen, Bar No. 136346
Yakov P. Wiegmann, Bar No. 245783
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
Telephone:     (415) 901-8700
Facsimile:     (415) 901-8701

Attorneys for Defendant
M.P. TECHNOLOGIES, INC.

GEARINGER LAW GROUP
Brian Gearinger, Bar No. 146125
825 Van Ness Avenue 4th Floor
San Francisco, CA 94109
Telephone:     (415) 440-3175
Facsimile:     (415) 440-3103

Attorneys for Defendants and Counterclaimants
MASUO YOSHIMOTO and M2M, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT R. CREAGER, an individual. | Case No.  C 05-01985 JSW |
| Plaintiff, | |
| v. | **DEFENDANTS' TRIAL BRIEF** |
| MASUO YOSHIMOTO, an individual; M.P. TECHNOLOGIES, a corporation; and M2M, INC., a corporation, | Trial Date:    March 24, 2008 <br> Place:        Courtroom 2, 17th Floor |
| Defendants. | Honorable Jeffrey S. White |
| MASUO YOSHIMOTO, an individual and M2M, INC., a corporation, | |
| Counterclaimants, | |
| v. | |
| ROBERT R. CREAGER, an individual, | |
| Counterdefendant. | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................ 1

II.   STATEMENT OF THE EVIDENCE ................................................ 2

    A.    The MOU ............................................................. 2

    B.    Creager's Bad Acts While Operating AMG ............................. 5

    C.    The Evidence Will Show This Court Lacks Personal Jurisdiction Over Defendant MPT .................................................... 6

III.  LEGAL DISCUSSION .......................................................... 7

    A.    The Undisputed Evidence Will Defeat The First Cause of Action For Breach of Contract ............................................. 7

        1.    Creager did not enter any agreement with MPT ..................... 7

        2.    The conduct of the parties establishes the equity compensation proposed in paragraph 10 of the MOU never became a contract ............... 9

            a.    Creager is an attorney ................................. 10

            b.    A formal employment agreement was drafted but not entered .......................................... 10

            c.    A rich e-mail record confirms that Creager's proposal to receive equity compensation never became contractual. ............. 11

            d.    Creager never even asked Yoshimoto to pay him equity compensation under the MOU ........................ 14

        3.    Creager has waived any rights he had to enforce the MOU ............ 15

        4.    MPT did not "ratify" the MOU ..................................... 15

    B.    Creager's Second Cause of Action for Breach of Covenant of Good Faith and Fair Dealing is Not a Separate Basis of Recovery ......................... 16

    C.    Creager Lacks Evidence to Support His Third Cause of Action for Fraud ......... 17

        1.    Defendants had no intention to mislead, and Creager did not rely to his detriment on supposed misrepresentations. ........................ 17

        2.    The evidence establishes Creager has suffered no damages recoverable under a fraud theory .................................... 18

    D.    Creager's Sixth Cause of Action for Common Counts Fails Because He Does Not Seek a Certain Sum of Money ................................ 19

        1.    Creager's alleged damages are not specific. ......................... 19

**TABLE OF CONTENTS**
(continued)

Page

2.  Further, common counts are improper where the defendant's obligation is something other than the payment of money. ...................... 19

3.  Moreover, Creager's common count claim must fail if his breach of contract claim fails. ........................................................................ 20

E.  This Court Lacks Personal Jurisdiction Over MPT ............................................. 20

1.  MPT does not have the necessary continuous contacts with California to support general jurisdiction. ................................. 21

2.  The exercise of specific jurisdiction over MPT is not warranted by the facts of this case. ................................................................. 22

3.  Yoshimoto's relevant acts cannot be imputed to MPT ............................ 23

4.  The Court must be especially careful in exercising jurisdiction over foreign corporations. ................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*American Telegraph & Telephone Co. v. Companie Bruxelles Lambert*,
   94 F.3d 586 (9th Cir. 1996)..................................................................... 20, 21

*Asahi Metal Industry Co. v. Superior Court*,
   480 U.S. 102 (1987) ................................................................................... 25

*Bankroft & Masters, Inc. v. Augusta National, Inc.*,
   223 F.3d 1082 (9th Cir. 2004) ................................................................... 21

*Burger King v. Rudzewicz*,
   471 U.S. 462 (1985) ....................................................................... 21, 22, 25

*Core-Vent Corp. v. Nobel Industries AB*,
   11 F.3d 1482 (9th Cir. 1993)............................................................... 23, 25

*Data Disc, Inc. v. Systems Technology Assoc's, Inc.*,
   557 F.2d 1280 (9th Cir. 1997 .................................................................. 20 22

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, PA*,
   290 F.3d 42 (1st Cir. 2002) ....................................................................... 25

*Gray & Co. v. Firstenberg Machinery Co., Inc.*,
   913 F.2d 758 (9th Cir. 1990)..................................................................... 20

*Helicopteros Nacionales de Colombia v. Hall*,
   466 U.S. 408 (1984) ............................................................................. 21, 22

*Hunt v. Erie Ins. Group*,
   728 F.2d 1244 (9th Cir. 1984).................................................................. 20

*In re First Alliance Mortgage*,
   471 F.3d 977 (9th Cir. 2007).................................................................... 18

*International Shoe Co. v. State of Washington*,
   326 U.S. 310 (1945) .................................................................................. 21

*Mattel, Inc. v. Greiner and Housser GmbH*,
   354 F.3d 857 (9th Cir. 2003)..................................................................... 21

*Myers v. Bennett Law Offices*,
   238 F.3d 1068 (9th Cir. 2001)................................................................... 24

*National Rural Telecommunications Co-op. v. DIRECTV, Inc.*,
   319 F.Supp.2d 1059 (C.D. Cal. 2003)......................................................... 8

*Ochoa v. J.B. Martin & Sons Farms, Inc.*,
   287 F.3d 1182 (9th Cir. 2002)................................................................... 24

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- iii -

DEFENDANTS' TRIAL BRIEF
C 05-10985 JSW

**TABLE OF AUTHORITIES**
(continued)

Page

*Omeluk v. Langsten Slip & Batbyggeri,*
   52 F.3d 267 (9th Cir. 1995)..................................................................................... 20

*Pacific Atlantic Trading Co., Inc. v. M/V Main Express,*
   758 F.3d 1325 (9th Cir. 1985).......................................................................... 22, 25

*Perkins v. Benguet Consolidated Mining Co.,*
   342 U.S. 437 (1952)................................................................................................. 22

*Roth v. Garcia Marquez,*
   942 F.2d 617 (9th Cir. 1991)................................................................................... 23

*Schwarzenegger v. Fred Martin Motor Co.,*
   374 F.3d 797 (9th Cir. 2004)............................................................................. 21, 22

*Sinatra v. National Enquirer,*
   854 F.2d 1191 (9th Cir. 1988)................................................................................. 25

*Theo H. Davies & Co., Ltd. v Republic of the Marshall Islands,*
   174 F.3d 969 (9th Cir. 1999)................................................................................... 24

*U.S. Vestor, LLC v. Biodata Information Technology AC,*
   290 F.Supp.2d 1057 (N.D.Cal. 2003) ..................................................................... 22

*Wagner v. U.S.,*
   71 Fed. Cl. 355 (Fed. Cl. 2006)................................................................................. 8

*Ziegler v. Indian River County,*
   64 F.3d 470 (9th Cir. 1995)..................................................................................... 21

STATE CASES

*Alliance Mtg. Co. v. Rothwell,*
   10 Cal. 4th 1226 (1999) .......................................................................................... 18

*Beck v. American Health Group International,*
   211 Cal. App. 3d 1555 (1989)................................................................................... 9

*Cicone v. URS Corp.,*
   183 Cal. App. 3d 194 (1986).................................................................................... 17

*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe and Takeout III, Ltd.,*
   30 Cal. App. 4th 54 (1994)...................................................................................... 15

*Emery v. Visa Int'l Serv. Ass'n,*
   95 Cal. App. 4th 952 (2002).................................................................................... 15

*Farmers Ins. Exch. v. Zerin,*
   53 Cal. App. 4th 445 (1997).................................................................................... 19

**TABLE OF AUTHORITIES**
(continued)

Page

*Foley v. Interactive Data Corp.,*
47 Cal. 3d 654 (1988) .................................................................. 17

*Freeman & Mills, Inc. v. Belcher Oil Co.,*
11 Cal. 4th 85 (1995) .................................................................. 17

*Guz v. Bechtel Nat'l, Inc.,*
24 Cal. 4th 317 (2000) ................................................................ 16

*Hays v. Temple,*
23 Cal. App. 2d 690 (1937) ......................................................... 20

*Kennecott Corp. v. Union Oil Co.,*
196 Cal. App. 3d 1179 (1987) ....................................................... 9

*McBride v. Boughton,*
123 Cal. App. 4th 379 (2004) ...................................................... 19

*O'Connor v. Dingley,*
26 Cal. 11 (1864) ...................................................................... 19

*Smith v. S.F.,*
225 Cal. App. 3d 38 (1990) ......................................................... 17

*Van't Rood v. County of Santa Clara,*
113 Cal. App. 4th 549, 571 (2003) ............................................... 15

*Wilhelm v. Pray, Price, Williams & Russell,*
186 Cal. App. 3d 1324 (1986) ..................................................... 18

*Woodbine v. Van Horn,*
29 Cal. 2d 95 (1946) ................................................................... 9

*Younan v. Equifax, Inc.,*
111 Cal. App. 3d 498 (1980) ....................................................... 17

STATUTES

Bus. & Prof. Code § 17200 ................................................................ 16

Civ. Code §§ 1709-1710 .................................................................. 17

## I.       **INTRODUCTION**

Plaintiff Robert Creager ("Creager"), a California lawyer, brings suit alleging defendants breached a memorandum of understanding ("MOU") that he had defendant Masuo Yoshimoto ("Yoshimoto") sign when they met in Melbourne, Australia in July 2004.  Yoshimoto was C.E.O. and Chairman of the Board of Defendant M.P. Technologies, Inc. ("MPT"), but made clear to Creager the MOU was strictly between him and Creager, not MPT.  Creager attempted to formalize the MOU at a later date, but Yoshimoto was unwilling to sign it.

Creager asserts that under the MOU and with $500,000 in financial backing from Yoshimoto's family-owned *Yugen-kaysya* company, defendant M2M, Inc. ("M2M"), Creager briefly operated a Delaware corporation named AMG MediaVision ("AMG") from his San Francisco residence.  He alleges AMG had as one of its purposes the management of acquisitions by MPT of hospitality-industry internet companies around the world.

Creager claims that under the MOU he is entitled to over $6 million for managing MPT's acquisition of several companies in the six months AMG existed.  This sum represents 3% of the stock of several companies acquired by MPT, as well as a 10-year option to purchase an additional 2% of each of those companies.

Defendants Yoshimoto and M2M have filed a counterclaim against Creager (here, and in Tokyo District Court in a parallel action) regarding the same operative facts.  Yoshimoto and M2M allege Creager arranged for and received a personal commission in excess of $1 million in connection with one of the transactions alleged in Creager's complaint, MPT's acquisition of a controlling interest in MagiNet Corporation of Singapore in May, 2005.  Not coincidentally, Creager purported to have Mr. Yoshimoto served with the complaint in this case during Yoshimoto's visit to San Francisco for the purpose of discussing with Creager the MagiNet commission.  Yoshimoto and M2M also seek the $500,000 which they contend Creager fraudulently induced M2M to send AMG; and allege Creager likely committed insider trading in connection with a second transaction described in Creager's complaint, MPT's acquisition of a controlling interest in Guest-Tek Interactive Entertainment, Ltd. of Calgary in November, 2004.  Finally, Yoshimoto and M2M seek their attorneys' fees and costs as damages for Creager's

1 | breach of an oral agreement to dismiss this action in exchange for Yoshimoto approving the

2 | payment of Creager's $1 million-plus MagiNet commission.

3 | II.  **STATEMENT OF THE EVIDENCE**

4 |     **A.**     **The MOU**

5 |       Creager is a graduate of Hastings College of Law, at all relevant times an active member

6 | of the California Bar.  In April 2004, Creager was unemployed and living in San Francisco when

7 | Mika Saitoh, his romantic partner, introduced him to Yoshimoto.  Deposition of Robert R.

8 | Creager ("Creager Dep.") at 12:10-11, 78:11-13.  Yoshimoto is Chief Executive Officer of MPT,

9 | a publicly traded company in Japan that provides on-demand movies and broadband services to

10 | hotels.  In May 2004, Creager and Saitoh met with Yoshimoto in Tokyo, where Creager agreed to

11 | start helping Yoshimoto expand MPT's operations outside of Japan and China.  Creager Dep. at

12 | 86:12-87:5.  Creager recalls that at the conclusion of the visit, he had a "handshake agreement"

13 | for Yoshimoto to fund approximately half a million dollars to start a California company.

14 | Creager Dep. at 88:11-13.

15 |       Creager and Yoshimoto next met in Melbourne, Australia in July 2004.  Creager presented

16 | Yoshimoto with a draft of a Memorandum of Understanding ("MOU") shortly after he and

17 | Yoshimoto arrived.  Creager Dep. at 99:13-16.  Yoshimoto made some minor edits, and Creager

18 | revised the document and asked Yoshimoto to sign it.  Creager Dep. at 112:24-113:9.  Creager

19 | knew that Yoshimoto is "a Japanese person who's not totally clear in English."  Creager Dep. at

20 | 32:6-15.  Creager never suggested to Yoshimoto that he should have an attorney review the MOU

21 | before he signed it, nor did he tell Yoshimoto the MOU is a binding contract.  Creager Dep. at

22 | 114:13-22; Yoshimoto Dep. at 170:15-20, Ex. C to Declaration of Robert B. ("Mullen Dec.").

23 | Creager and Yoshimoto never discussed the MOU (Ex. A to the Complaint, Ex. A to Mullen

24 | Dec.) after they signed it on July 11, 2004.  Creager Dep. at 130:1-5 and 177:4-9.

25 |       The MOU contemplated the formation of a company named AMG, with Creager as its

26 | CEO.  The MOU called for Yoshimoto's limited liability company, M2M, to provide start-up

27 | funding to AMG in the amount of $500,000.  The purpose of AMG as stated in the MOU was to

28 | distribute MPT software, products and services outside Japan and China, and serve as an

1    acquisition management company for MPT.

2        Creager alleges the MOU is a contract.  He acknowledges he entered the MOU with

3    Yoshimoto individually and/or M2M, not with MPT.  Yoshimoto informed Creager after their

4    Tokyo meeting that MPT would not enter an agreement of this nature.  Creager therefore

5    prepared the MOU only for Yoshimoto's signature.  Creager Dep. at 138:3-12.  The aspect of the

6    MOU Creager seeks to enforce in this lawsuit is found in paragraph 10:

7
8
9
> [A]t the closing of each acquisition by MPT managed by AMG
> (whether the direct acquiror is AMG or MPT or a related entity)
> Robert Creager will receive 3% of the stock of the acquired
> company plus a 10-year option to purchase an additional 2% at the
> acquisition price per share.

10    Paragraph 10 contemplated this equity compensation and other compensation would be provided

11    to Creager in an employment agreement making him CEO of AMG.  Ex. A to Mullen Dec.

12        In early August 2004, Yoshimoto transferred approximately $500,000 to an account

13    Creager established for starting AMG.  Creager had already hired the Wilson Sonsini firm to

14    draw up an employment agreement between him and AMG.  Discussed below, that agreement

15    varied from the MOU in a significant respect concerning equity compensation.  Later in the

16    month, Creager presented the employment agreement to Yoshimoto for his signature.  Creager

17    Dep. at 140:12-22.  Yoshimoto did not sign or assent to the agreement.  Creager Dep. at 140:23-

18    141:3, 144:22-23.  Creager hired two employees, Ms. Saitoh (director of business development)

19    and an engineer named Hilmi Ortadeveci (technical director).  Creager paid their salaries from the

20    start-up funds, as well as his own salary at a rate of $300,000 per year plus a starting bonus of

21    $37,500.

22        As evidenced below, by late September, 2004, it became clear to Creager and Yoshimoto

23    that AMG was never going to be "an acquisition management company for MPT," and no further

24    discussions took place regarding any right of Creager to equity compensation in companies

25    acquired by MPT – the 3% stock and 2% option described in paragraph 10 of the MOU.  In fact,

26    Creager never asked Yoshimoto for any portion of this equity compensation before he filed this

27

28

1   lawsuit.[1]

2        By Yoshimoto's account, within several months after he funded AMG the $500,000, it

3   became evident that Creager was an irresponsible spender and not the capable executive he had

4   held himself out to be.  Yoshimoto nevertheless strived to find a useful purpose for Creager and

5   the two AMG employees.  Much of their work in late-2004 involved Guest-Tek Interactive

6   Entertainment Ltd. ("Guest-Tek"), a publicly traded Canadian video on-demand company.  In

7   August, 2004, Creager had proposed to Yoshimoto that MPT acquire Guest-Tek,[2] and MPT

8   moved forward with the acquisition.  The AMG employees then primarily assisted Guest-Tek

9   with internalizing MPT's "middleware" called MBOS.  By 2005, however, AMG had little to do

10  and Yoshimoto could not justify investing any more money into AMG.  On March 2, 2005,

11  Yoshimoto informed Creager that he would provide no further funding, effectively ending AMG.

12       Between January and May, 2005, MPT acquired controlling interests in three companies:

13  Guest-Tek of Calgary; LogicLink, with an office in Irvine; and MagiNet Corporation, Creager's

14  old company,[3] now headquartered in Singapore.  The amounts of the respective investments were

15  approximately $40 million, $7.5 million and $70 million, a total of over $100 million against

16  which Creager claims ownership of 3%, based on the proposition AMG "managed" the

17  acquisitions.  Creager and AMG did not "manage" these acquisitions in any ordinary sense of that

18  word.  Rather, Creager appears to have functioned as a facilitator, at most an advisor to

19  _____
    [1] Other proposals in the MOU also fell by the wayside.  Paragraph 7 of the MOU provided : "[A]n additional cash
20  injection of at least US$500K will be made by MPT to AMG by the end of 2004."  Creager Dep. at 107:10-14 and
    Ex. 56.  On November 17, 2004, Plaintiff wrote an email to Yoshimoto that said: "What is your idea about the next
21  AMG financing?  Would you prefer to keep all AMG financing under M2M?  Or maybe it would be possible for
    Guest-Tek to invest in AMG?  Or maybe NeoIndex or Vodaphone?  We need to finalize the next AMG financing by
    the end of January."  Creager Dep. at 190:3-10 and Ex. 67.

22  [2] Creager then purchased approximately 103,000 shares of Guest-Tek stock at approximately $4 per share.  Creager
23  Dep. at 247:3-5 and 256:17-257:4.  When Creager purchased the shares, he knew MPT was interested in purchasing
    Guest-Tek.  Creager Dep. at 250:17-252:15.  Creager also knew that MPT's interest in purchasing Guest-Tek had not
24  been disclosed publicly to the market.  Creager Dep. at 253:7-10.  Creager sold approximately one-half his Guest-Tek
    shares for approximately $6.50 per share in early 2005.  Creager Dep. at 256:10-259:6.

    [3] In the 1990s, Creager started and served as CEO of MagiNet, a Hong Kong-based hotel video company.  According
25  to MagiNet's current CEO N.Y. Lee, Creager ran MagiNet into the ground by accumulating too much debt to make
    the interest payments.  As a result, in 2000 Lee and Kevin Lee (not related) purchased the debt of MagiNet and
26  converted it into equity in the newly reconstituted MagiNet, becoming the majority owners.  The Lees then forced
    Creager to resign.  Dep. of N.Y. Lee at 35:23-36:6, 64:5-18 and Ex. 90.  MagiNet is the largest company in the
27  video-on-demand and high-speed Internet services for the hospitality industry in the Asia-Pacific region.  Complaint,
    ¶ 18.

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' TRIAL BRIEF
C 05-10985 JSW

1   Yoshimoto, and a well-compensated advisor at that.

2   **B.      Creager's Bad Acts While Operating AMG**

3   As set forth in Yoshimoto's counterclaims, this lawsuit concerns more than defendants'

4   alleged breach of a pre-contract. It appears Creager filed this lawsuit at least in part to help him

5   collect a $1,062,750 "finder's fee" that he had secretly arranged with MagiNet while Creager was

6   still the CEO of AMG and owed a fiduciary duty to AMG.

7   On December 25, 2004, Creager and N.Y. Lee discussed a possible acquisition of

8   MagiNet by MPT. Creager Dep. at 259:19-22, 260:1-10. On January 14 and January 15, 2005,

9   the two exchanged emails in which they negotiated the amount of a "finder's fee" to Creager.

10  Deposition of N.Y. Lee ("N.Y. Lee Dep.") at 79:11-14, 82:12-15 and Exs. 94 and 95, and Creager

11  Dep. at 261:14-262:23. In February 2005 at a meeting in Bangkok, Creager and Lee reached

12  agreement on the fee: 1.5% of MPT's purchase price of MagiNet. Creager Dep. at 265:14-266:7.

13  Lee Dep. at 64:5-18, 70:9-71:16 and Exs. 90 and 91. Thus, at the very time Creager was

14  purporting to assist MPT to consider buying a controlling interest in MagiNet and then to

15  negotiate the purchase of MagiNet with the Lees, he was negotiating and consummating an

16  agreement with NY Lee to be paid 1.5% of the value of the MagiNet shares purchased by MPT.

17  In effect, he "played both sides of the deal." Creager never told Yoshimoto about his agreement

18  with Lee. Creager Dep. at 266:12-17, 269:11-14.[4]

19  Yoshimoto discovered Creager's finder's fee deal in late April, 2005 when conducting due

20  diligence on the MagiNet acquisition. Furious, he asked NY Lee not to pay Creager and met with

21  Creager on May 14, 2005 in the San Francisco Hilton. During this meeting, Creager caused

22  Yoshimoto to be served with the summons and complaint in this action. Creager Dep. at 270:9-

23  271:15. The meeting continued into the night and ended the following day, when Creager gave

24  Yoshimoto a ride to the San Francisco airport. By Yoshimoto's account, Creager and Yoshimoto

25  _____

26  [4] Also unbeknownst to Yoshimoto, Creager had sued the Lees and MagiNet in June, 2002 in Santa Clara County Superior Court, alleging the Lees breached an agreement to convey to him a percentage of MagiNet's shares,

27  pursuant to several versions of a disputed contract that accompanied his ouster from MagiNet. In July 2004, just days after Creager and Yoshimoto signed the MOU here, the Lees agreed to pay Creager nearly $2 million in settlement. Creager Dep. at 20:1-22:14.

28

1   made an oral agreement under which Yoshimoto would approve MagiNet's payment of the

2   $1,062,750 to Creager, and in exchange Creager would "stop" this lawsuit and invest the money

3   in a prospective project of Yoshimoto's.  Yoshimoto kept his promise, and in May 2005, Lee paid

4   Creager the $1,062,750.  Creager did not keep his promises.  Creager disputes he made this

5   agreement, but he admits to sending this email on June 14, 2005:

6           Although I want to help you in any way that I can, my attorneys
        have informed me that it is impossible to delay the lawsuit because
7           it has already been filed.  It will take a few months to run its course
        but it cannot be stopped.

8

9   Creager Dep. at 27:13-28:4 and Ex. 43.  He further admits, as he must, that he had the ability to

10   "delay" or dismiss the lawsuit; but explains his email was merely an expression that it was

11   "inadvisable and impractical" for him to dismiss this lawsuit, based on privileged advice from his

12   attorneys.  Creager Dep. at 28:18-35:4.

13       **C.**      **The Evidence Will Show This Court Lacks Personal Jurisdiction Over**
              **Defendant MPT**
14

15       The Court denied Defendant MPT's motion to dismiss for lack of personal jurisdiction

16   brought in response to the Complaint.  However, the evidence developed in this case has not

17   borne out Creager's allegations of "minimum contacts," and the "preponderance of the evidence"

18   standard he will need to meet at trial is more difficult than the "prima facie" showing he needed

19   to make on the motion to dismiss.

20       The evidence at trial will show MPT lacks sufficient contacts with this forum under both

21   the "general" and "specific" branches of personal jurisdiction discussed below.  MPT is a

22   Japanese corporation publicly traded on the "Mother's" section of the Tokyo Stock Exchange,

23   with its principal place of business in Tokyo, Japan.  Yoshimoto Dec. ¶ 2.  It is engaged in the

24   business of broadband infrastructure development, system development and operational support,

25   providing internet services to hotels primarily in Japan.  *Id.*  MPT is not incorporated in

26   California, nor has it qualified to do business in California.  *Id.*, ¶ 4.  MPT has no subsidiary

27   incorporated in California.  *Id.*  The most Mr. Creager can argue is that in 2005 MPT became

28   75% owner of the small Michigan company LogicLink, which has an office in Irvine, California.

1   Yoshimoto Dec., ¶ 4.  As discussed below, this does not confer personal jurisdiction over MPT.

2   Other important jurisdictional facts are that no officer or director of MPT resides or is

3   domiciled in California; MPT has no employee residing or domiciled in California; MPT has no

4   branch office or comparable facility in California; MPT has no telephone listing or mailing

5   address in California; and MPT has no bank account or other tangible property in California.

6   Yoshimoto Dec., ¶¶ 5-8.  While it is true that MPT has managed to develop affiliations with

7   companies in North America, MPT itself does not direct advertising toward California residents,

8   nor advertise in a publication that is directed primarily toward California residents. *Id.*, ¶ 9.  No

9   meeting of MPT's board of directors or shareholders has taken place in California. *Id.*, ¶ 10.  In

10  contrast, the only meeting ever held of the board of directors of the company Mr. Creager alleges

11  he operated, AMG, took place in Tokyo. *Id.*

12  As a separate matter, the actions of defendant Yoshimoto in California relating to this

13  dispute are minimal.  He allegedly funded AMG through M2M, which wired money to AMG

14  from Tokyo.  He met with Creager in California several times.  Yoshimoto Dec., ¶ 12.  Creager

15  attempts to leverage his claims against Yoshimoto by suing the "deep pocket" of MPT in an

16  inappropriate forum, in a foreign language and in circumstances imposing considerable and

17  unnecessary expense on MPT.

18  **III.    LEGAL DISCUSSION**

19      **A.    The Undisputed Evidence Will Defeat The First Cause of Action For Breach
    of Contract**

20

21          **1.    Creager did not enter any agreement with MPT.**

22  Creager admitted several times at deposition that he did not enter the MOU with

    defendant MPT, only with defendants Yoshimoto and M2M.  Since he made no agreement with

23  MPT, his breach of contract claim against MPT should fail as a matter of law.

24  Mr. Creager testified:

25        Q:    Did you discuss with Mr. Yoshimoto at all whether he
    would seek to obtain Board approval of the MPT Board of
26        Directors for entering an agreement with you?

27        A:    I don't recall if we discussed it, but the agreement is not
    with MPT so there was no reason for me to assume he would be
28        asking MPT for approval.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 7 -

DEFENDANTS' TRIAL BRIEF
C 05-10985 JSW

1

Q.      The agreement is – if I understand you correctly, the MOU is between you and Masuo Yoshimoto; right?

2

3

A:      And M2M, it was my understanding.

Q:      So when you and Mr. Yoshimoto signed the MOU on July 11, 2004, am I correct in saying it was your understanding that you were entering the MOU with Mr. Yoshimoto and M2M, but not with MPT?

4

5

6

A:      Yes, that's my understanding.

7

Creager Dep. at 134:21-135:16.

8

Creager, an attorney, drafted the MOU.  (Yoshimoto is not an attorney.)  The MOU

9

contains no signature line for MPT.  However, an earlier proposed consulting contract that he

10

drafted did contain a signature line for MPT.  Creager Dep. at 135:17-136:12, and Ex. 57.

11

Creager explained this as follows:

12

Q:      Now, you made it with a signature line for MP Technologies, Inc., by its chairman CEO.  Do you see that?

13

A:      Yes.

14

Q:      Yet the MOU that was later signed by you and Mr. Yoshimoto, as you've testified, was for Mr. Yoshimoto's signature but not MP Technologies, Inc.  Why the switch?

15

16

A:      The switch was at his request.  He explained to me M2M's role and why it was going to be M2M.

17

Creager Dep. at 138:3-12.

18

Creager then admitted:

19

20

Q:      Now, you understood your deal, to the extent you had a deal, was with Mr. Yoshimoto, not MPT; right?

21

A:      Yes.

22

Creager Dep. at 157:15-17.[5]

23

---

24

[5] After the deposition, Creager's attorneys substituted a written correction to this answer: CHANGE "Yes." TO "Yes, in the sense that the MOU was with Mr. Yoshimoto, but AMG's operation was to be for the benefit of MPT. Also, on several occasions, Mr. Yoshimoto affirmed that AMG and I were working on MPT's behalf, in statements he made to me and to others in his role as Chairman and CEO of MPT." This change is not evidence that MPT was a party to the MOU. Rather, it suggests MPT was a third-party beneficiary of the MOU, which does not give rise to any obligation on the part of MPT. *See National Rural Telecommunications Co-op. v. DIRECTV, Inc.*, 319 F.Supp.2d 1059, 1068 (C.D. Cal. 2003)  (modified on other grounds) ("a third party beneficiary does not have a duty to perform under the contract and, thus, cannot be sued for breach"); *Wagner v. U.S.*, 71 Fed. Cl. 355, 364 (Fed. Cl. 2006) ("[A]lthough the parties to a contract incur an enforceable duty to an intended third-party beneficiary of the contract, the beneficiary makes no return promise and incurs no duties by virtue of the contract.").

25

26

27

28

1    Mr. Creager was given another opportunity to deem MPT a party to the MOU, but did not:

2        Q:    Now, the MOU also, you know, refers to MPT.  Did you
              have any belief or understanding as to how MPT might be brought
3            to – or required to perform given that MPT wasn't a party to the
              MOU?
4
        A:    Well, Mr. Yoshimoto was the founder and chairman and 30
5            percent shareholder of MPT.  So I believed that he had the ability to
              get them to perform.
6
    Creager Dep. at 138:20-139:1.
7
        Creager's account is mirrored by the deposition of Mr. Yoshimoto, who testified:
8
        [T]his memorandum of understanding is really a summary of the
9            discussions that occurred between two individuals, Robert Creager
              and Masuo Yoshimoto.  And the company, MPT, is not involved in
10           here.

11   Deposition of Masuo Yoshimoto ("Yoshimoto Dep.") at 65:8-12.

12       Therefore, the evidence shows Creager did not enter the alleged agreement with defendant

13   MPT.

14       **2.    The conduct of the parties establishes the equity compensation
                proposed in paragraph 10 of the MOU never became a contract.**
15

16       The MOU is nothing more than an "agreement to agree" which cannot be enforced as a

17   contract unless the parties clearly intended to be bound by it.  *See, e.g., Beck v. American Health*

18   *Group International,* 211 Cal. App. 3d 1555, 1562-63 (1989).  The most compelling extrinsic

19   evidence of the parties' intent, by far, is the behavior of the parties before any dispute arose.  *See*

20   *Woodbine v. Van Horn,* 29 Cal.2d 95, 104 (1946) ("a construction given the contract by the acts

21   and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its

22   meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the

23   court"); *Kennecott Corp. v. Union Oil Co.,* 196 Cal. App. 3d 1179, 1189 (1987) ("The conduct of

24   the parties after execution of the contract and before any controversy has arisen as to its effect

25   affords the most reliable evidence of the parties' intentions").

26       Paragraph 10 of the MOU expressly refers to a separate "employment agreement" for

27   Creager that would be entered into sometime in the future, but was not.  The evidentiary record is

28   replete with instances in which Creager would have behaved differently had he considered the

MOU itself to be a binding contract, or if he believed he was entitled to receive stock or stock options under paragraph 10 of the MOU.  Throughout their relationship, Creager never once asserted any right to such equity compensation – indeed, he explicitly stated that he did not assert any right to it.  The first time that Creager ever made a claim for this equity compensation was when he filed this lawsuit.

### a.      Creager is an attorney.

Creager is a licensed attorney who drafted the MOU.[6]  The very week he and Yoshimoto signed the MOU, Creager settled his own 2-year lawsuit against MagiNet based on breach of an alleged contract!  He, of all people, had the knowledge and incentive to treat the MOU as a contract if he actually believed it was one.  Yet he testified:

> Q:      During the existence of AMG, did you ever tell Mr.
> Yoshimoto that you thought the MOU was an enforceable contract
> between you and him?
>
> A:      I had no reason to do that.

Creager Dep. at 197:11-14.  He also testified:

> Q:      Is there any document or writing that you are aware of in
> which either you or Mr. Yoshimoto acknowledges or states their
> opinion that the MOU is a legal contract or agreement?
>
> A:      I don't recall.

Creager Dep. at 201:18-22.

### b.      A formal employment agreement was drafted but not entered.

Paragraph 10 of the MOU contemplates a future employment agreement containing the equity compensation terms that Creager attempts to enforce in this lawsuit.  In the month after the MOU was signed, Creager hired the Wilson Sonsini law firm (with M2M's money) to prepare an employment agreement titled "Robert Creager Employment Agreement."  Ex. 58, and Creager Dep. at 139:2-15.  This formal document contained equity compensation language similar to, but not the same as, the language in paragraph 10 of the MOU.  While the MOU contemplated equity

---

[6] See also Complaint at ¶ 18 (discussing Creager's "executive background" and "more than 30 years' experience in international business and in high-tech companies").

1    compensation to Creager for acquisitions "managed" by AMG, the Robert Creager Employment

2    Agreement materially altered this standard by providing for equity compensation to Creager if

3    AMG merely "is instrumental in assisting in an acquisition.." The Robert Creager Employment

4    Agreement contains signature lines for Robert Creager and AMG MediaVision. Creager testified

5    he contemplated that Mr. Yoshimoto would sign the agreement on behalf of AMG MediaVision,

6    but the agreement was never signed. Creager Dep. at 144:15-23. Therefore, Creager and

7    Yoshimoto never reached an agreement regarding equity compensation.

8              c.       **A rich e-mail record confirms that Creager's proposal to
                        receive equity compensation never became contractual.**

9

10       In September, 2004, MPT took steps toward acquiring Guest-Tek. Creager wrote to

11   MPT's Ryuzo Nakazumi:

12           I understand AMG is not legally part of MPT …

13           I also understand that you are in charge of acquisitions. If I can be
             of service to you please do not hesitate to ask.
14

15           With respect to acquisitions which I introduced to MPT, such as
             Guest-Tek, I would very much appreciate if you would be so kind
             to keep me informed about what is going on. I have personal
16           relationships there and prefer not to be embarrassed by not knowing
             what is going on.
17
     Ex. 29, and Saitoh Dep. at 99:18-101:22.[7]
18
         He also wrote to Yoshimoto:
19
             In order to support MPT after finding, for my own information
20           purposes I would like to be an informal member of the acquisition
             team for each M&A target. I want only to be informed, not to be
21           part of the day-to-day execution effort.

22
     Ex. 31, and Saitoh Dep. at 124:1-30.
23
         Thus, by September 28, 2004 Creager knew that his hope of equity compensation which
24
     he had proposed in paragraph 10 of the MOU would never come to fruition and that his role, if
25
     any, at the fringes of the contemplated acquisition by MPT could not entitle him to equity in
26

27   _____
     [7] Creager chose his words carefully. He first sent a draft of this e-mail to Mika Saitoh for her review, as the e-mail
     responded to her earlier phone call with Nakazumi. Ex. 65 and Creager Dep. at 178:23-180:24.
28

1  Guest-Tek.  He privately protested to Yoshimoto:

2          Now I am not so sure that I properly understand what AMG is
           supposed to be doing.  Even AMG's proper role with Guest-Tek
3          must be discussed.  I have the relationship with Arnon and the
           experience to manage Guest-Tek for MPT but according to
4          Nakazumi-san I should not be involved.

5  Ex. 64, and Creager Dep. at 172:15-22.  He also tried to revive the MOU:

6          You and I made an agreement when we met in Australia.  We even
           wrote it down and signed it.  Is that agreement still valid?
7

8  Ex. 64.  Creager testified Yoshimoto did not respond to his question.  Creager Dep. at 175:24-

9  176:19.[8]

10         In early December, 2004, as the Guest-Tek acquisition neared completion, Creager

11 continued to angle for compensation beyond his $300,000 annual salary.  With the assistance of

12 Ms. Saitoh, he prepared a PowerPoint presentation which termed his original plan with

13 Yoshimoto not a contract, but the "Original Vision."  Ex. 68, and Creager Dep. at 192:11-193:3.

14 In this document, the "Original Vision" is contrasted with "Actual Events" and a scenario for

15 "How to Fix?"  The "Original Vision" and "How to Fix?" pages, like paragraph 10 of the MOU,

16 place Creager's company, AMG, in the center of acquiring and managing corporate targets; the

17 "Actual Events" page shows that AMG simply found Guest-Tek.  Had Creager considered the

18 MOU to be a binding contract, he surely would not have referred to its terms as a "vision."

19         As AMG ran out of money in early 2005, it became apparent to Creager that he and AMG

20 served no useful purpose to Yoshimoto and it was doubtful Yoshimoto, M2M, or anyone else

21 would continue to pay the salaries and expenses of Creager and his two employees.  Many e-

22 mails were sent between the parties addressing potential roles AMG might serve and how Creager

23 and AMG might be compensated.  On February 19, 2005, in one such e-mail Creager wrote to

24 ─────────────────────
[8] Creager also testified:

25         Q:      Did [Yoshimoto] – by this date of September 28, 2004, had you ever discussed
                   with him, since the MOU was signed, whether there was an operative agreement between
26                 you and him?

           A:      No.  We never discussed the agreement after we signed.
27
   Creager Dep. at 177:4-9.
28

Yoshimoto:

> According to our agreement I should receive stock and stock
> options in Guest-Tek and LogicLink.  Please note that I do NOT
> insist on our original agreement, but I do insist that we now agree
> on a fair settlement for those two deals and a new agreement for
> future deals.

Ex. 81 and Creager Dep. at 227:6-9.  Creager testified the agreement he referred to was the MOU

of July 11, 2004.  Creager Dep. at 227:24-228:1.  He also testified:

> Q:     Now, at any time before February 19, 2005, did you ever
> tell Mr. Yoshimoto you thought you were entitled to stock or stock
> options under the MOU?
>
> A:     I don't remember.  I don't think so.  Again, we had an
> agreement.  It had been signed a mere six months earlier.  So, yeah,
> I didn't feel the need to keep reminding everyone of my rights
> under the agreement.

Creager Dep. at 232:20-233:2.

The next day, February 20, 2005, Creager sent MPT's Nakazumi an e-mail which makes

no sense if Creager thought he was entitled to equity compensation under paragraph 10 of the

MOU.  In the e-mail he asked MPT, in effect, for bonuses to AMG:

> Since MPT has received all of the benefit of our acquisitions work
> it seems fair that maybe MPT should pay for our expenses and time
> spent on such work.
>
> …
>
> Please inform me if you would agree to pay consulting fees to
> AMG for our time spent on MPT acquisition projects and if so how
> much you would suggest to pay.
>
> Finally, Mr. Yoshimoto informed me a few months ago that AMG
> would receive a "finder's fee" for the Guest-Tek acquisition.
> Please consider that and inform me if that is a real possibility.

Ex. 70 and Creager Dep. at 205:14-23.[9]  Creager acknowledges he and the two others at AMG

were paid salary for their work ($387,500 in six months, out of the $500,000 funded by M2M),

and that in this e-mail he was seeking additional compensation.  Creager Dep. at 206:11-21.

---

[9] This was Creager's second request to MPT for consulting fees and a finder's fee for the Guest-Tek acquisition.  See Ex. 49 and Creager Dep. at 56:9-13.  See also Ex. 69 and Creager Dep. at 202:6-12.  MPT subsequently agreed to pay, and did pay, a finder's fee of $34,000.

**d.    Creager never even asked Yoshimoto to pay him equity compensation under the MOU.**

After it became official that Yoshimoto would not provide further funding for AMG, Creager sent numerous e-mails to Yoshimoto asking for various items of additional compensation for himself and the two AMG employees, including severance pay (which had never before been discussed or agreed to) and payment of AMG's outstanding expenses, an amount exceeding $50,000. *See, e.g.*, Exs. 76, 77, 78 and 80, and Creager Dep. at 217:1-218:17. In none of these communications did Creager make any reference to the MOU or ask for equity in the acquired companies.

In fact, the only time that Creager claims he told Yoshimoto he was entitled to anything under the MOU was in a supposed phone call in March, 2005, after their relationship ended.[10] According to Creager, the phone call was vague:

> Q:    And earlier you described a phone call in March of 2005 where you said that you told Mr. Yoshimoto you had an agreement that you intended to hold him to. Was it in that phone call where you addressed with him amounts that you believe that he owed you personally?
>
> A:    Well, indirectly. We didn't discuss specific amounts, but I referred to the agreement which has amounts in it.
>
> Q:    Did you ever tell Mr. Yoshimoto that you thought that you should receive 3 percent of the stock of any acquired company pursuant to the MOU?
>
> A:    We had an agreement to that effect so I didn't see the need of telling him that.

Creager Dep. at 220:21-221:8.

In sum, Creager's conduct is wholly inconsistent with a belief the equity compensation

---

[10] Mr. Yoshimoto disagrees that such a phone call took place. Creager testified he does not recall any circumstances of the call, including who initiated the call, where he was, what phone he used and how long the call lasted. Creager Dep. at 197:15-201:9 and 222:25-225:13. In fact, Mr. Creager's own declaration contradicts his testimony:

> "Yoshimoto sent me an e-mail dated April 6, 2005 – the first time that I had heard from him since his March 2, 2005 e-mail cutting off AMG's funding."

Declaration of Robert R. Creager in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Service of Process, at ¶ 32, ¶¶ 28-31, Ex. F to Mullen Dec.

1  proposal in the MOU was in effect, or entitled him to further compensation. No reasonable fact

2  finder can conclude from the evidence that the parties considered paragraph 10 of the MOU a

3  binding agreement for equity compensation.

4         **3.**      **Creager has waived any rights he had to enforce the MOU.**

5        Noted above, Creager stated in writing on February 19, 2004: "According to our

6  agreement I should receive stock and stock options in Guest-Tek and LogicLink. Please note that

7  I do NOT insist on our original agreement …" In doing so, he waived any rights he may have

8  had under the MOU to receive the stock and stock options he seeks in this lawsuit.

9        "Waiver is the intentional relinquishment of a known right after knowledge of the facts."

10  *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe and Takeout III, Ltd.*, 30 Cal. App. 4th 54, 60

11  (1994). "The pivotal issue in a claim of waiver is the intention of the party who allegedly

12  relinquished their known legal right." *Id.* To the extent Creager believed he had any rights to the

13  stock or stock options under the MOU, his emphatic disavowal of them in this e-mail (followed

14  by no other communication on the subject) constitutes an intentional waiver of such rights.

15         **4.**      **MPT did not "ratify" the MOU.**

16        Creager has argued MPT "ratified the MOU by following through on a working

17  relationship that the MOU established and by accepting the substantial benefits of Creager's

18  performance." However, an entity that is not claimed to be a party to a contract cannot "ratify"

19  the contract. "Ratification is possible only when the person whose unauthorized act is to be

20  accepted purported to act as agent for the ratifying party." *Van't Rood v. County of Santa Clara*,

21  113 Cal. App. 4th 549, 571 (2003) (citation omitted); *see also Emery v. Visa Int'l Serv. Ass'n*, 95

22  Cal. App. 4th 952, 961 (2002); 3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency and

23  Employment, § 95 at 142. Here Yoshimoto did <u>not</u> purport to act as an agent for MPT in signing

24  the MOU. Creager's testimony establishes very clearly that Yoshimoto told him MPT would <u>not</u>

25  enter an agreement with him. Creager admits he drafted the MOU with this in mind, unlike an

26  earlier proposed contract that he prepared for MPT's signature. (Ex. 57 to Creager Dep.)

27  Therefore, the doctrine of ratification does not apply.

28        As a separate matter, MPT did not approve the MOU. Creager's argument shows this:

1
2
3

> In particular, MPT's second-in-command at the time, Ryuzo
> Nakazumi, appeared concerned about protecting his turf within
> MPT, and made it difficult for Creager and AMG to help MPT with
> the Guest-Tek acquisition.

4   Plaintiff's Brief in Opp. To MSJ, at 6:9-11.  Creager refers to Nakazumi's "obstructionism" and

5   states he "sought to placate Nakazumi."  *Id.* at 6:15, 17.  Creager also argues that "by taking over

6   Guest-Tek directly instead of through AMG – though that was authorized under the MOU – MPT

7   had started weakening AMG's independent potential."  Opp. Brief at 11:18-20.  Defendants'

8   evidence shows Nakazumi told Mika Saitoh on September 28, 2005 that "AMG is not

9   representing MPT" and that Nakazumi did not think Yoshimoto and Creager had "established a

10  relationship."  Ex. 132 and Saitoh Dep. at 209:5-210:22.  There is no persuasive evidence

11  supporting a "ratification" argument.

12   **B.    Creager's Second Cause of Action for Breach of Covenant of Good Faith and**
          **Fair Dealing is Not a Separate Basis of Recovery**

13

14          Defendants will ask the Court to enter judgment as a matter of law on Creager's second,

15  third and sixth causes of action.  The Court has already granted partial summary judgment as to

16  the fourth and fifth causes of action (Bus. & Prof. Code § 17200, and unjust enrichment).

17          The implied covenant of good faith and fair dealing is a promise, implied in all contracts,

18  to give the other party the cooperation it needs to successfully perform its contractual obligation.

19  1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 798 at 892.  However, where breach

20  of an actual contract is alleged, a separate implied covenant claim, based on the same breach, is

21  superfluous.  *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 327 (2000).  Creager's second cause of

22  action for "Breach of Covenant of Good Faith and Fair Dealing" simply states, "Defendants, in

23  bad faith, have failed to provide Creager the compensation he has earned pursuant to the

24  agreement."  Complaint at ¶ 50.  In *Guz*, the California Supreme Court affirmed summary

25  judgment of an employee's implied covenant cause of action where the employee had also

26  asserted a cause of action for breach of contract.  *Id.* at 352-53.  Here, too, the Court should deem

27  this cause of action superfluous and dismiss it.

28          As a separate matter, implied covenant actions sounding in tort are only available in

1   insurance bad faith actions; outside that context, a party suing for breach of the implied covenant

2   of good faith and fair dealing can only recover contract damages.  *See Foley v. Interactive Data*

3   *Corp.*, 47 Cal.3d 654, 684, 686 (1988); *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal.4th 85,

4   95 (1995).

5        Finally, if no contract existed between Creager and any of the defendants, Creager's

6   implied covenant claim against that defendant fails as a matter of law, because a contractual

7   relationship is a prerequisite for such a claim.  *Smith v. S.F.*, 225 Cal. App. 3d 38, 49 (1990).

8        **C.     Creager Lacks Evidence to Support His Third Cause of Action for Fraud**

9             **1.     Defendants had no intention to mislead, and Creager did not rely to
             his detriment on supposed misrepresentations.**

10

11        "Fraud is an intentional tort, the elements of which are (1) misrepresentation;

12   (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and

13   (5) resulting damage."  *Cicone v. URS Corp.*, 183 Cal. App. 3d 194, 200 (1986); *see also* Civ.

14   Code §§ 1709-1710; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, at 778.)  Fraud

15   is a charge that is easily made but less often substantiated.  In order to establish a cause of action

16   for fraud, a plaintiff must plead and prove in full, factually and specifically, all of the elements of

17   the cause of action.  *Wilhelm v. Pray, Price, Williams & Russell*,186 Cal. App. 3d 1324, 1331,

18   231 Cal. Rptr. 355 (1986).)  General and conclusory claims of fraud will not suffice.  (*Id.*; *see*

19   *also* 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 662, at 111.

20        At his deposition, Creager could not point to specific facts suggesting any of the

21   defendants misled or defrauded him.  *See* Creager Dep. at 289:10 – 290:18.  Indeed, the acts of

22   fraud that Creager alleges in his complaint (that Yoshimoto promised to sign AMG corporate

23   documents but did not, and that Yoshimoto and Nakazumi gave him certain assurances – *see*

24   Complaint at ¶¶ 55, 56) occurred well after Creager alleges he undertook to operate AMG in

25   reliance on the MOU.  The fraud allegations, at best, simply rehash the terms of the MOU by

26   stating Yoshimoto had no intention of performing them at the time he signed the MOU.

27   Complaint, ¶ 57.  These allegations do not support a separate cause of action for fraud against any

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' TRIAL BRIEF
C 05-10985 JSW

1    of the Defendants. *See, e.g., Younan v. Equifax, Inc.*, 111 Cal. App. 3d 498, 511-513 (1980).[11]

2         **2.    The evidence establishes Creager has suffered no damages recoverable**
3              **under a fraud theory.**

4         As a separate matter, Creager seeks only "benefit-of-the-bargain" damages, not

5    recoverable in a claim for fraud not involving a fiduciary. *See Alliance Mtg. Co. v. Rothwell*, 10

6    Cal. 4th 1226, 1240 (1999); *In re First Alliance Mortgage*, 471 F.3d 977, 1101 (9th Cir. 2007).

7    Creager has not suffered "out-of-pocket" any damage as a result of the alleged fraud. Rather, he

8    walked away with a finder's fee of $1,062,750 and over $200,000 in salary and bonus. He

9    attempts to itemize fraud damages at ¶ 60 of the complaint:

10             60.    The aforementioned false representations by defendants and
             the subsequent successfully committed fraud resulted in Plaintiff's
11           loss of personal funds; deprivation of the economic benefits that he
             reasonably anticipated through the agreement and his diligent and
12           successful performance; considerable but uncompensated
             expenditure of time; and opportunity costs, all in an amount to be
13           proven at trial.

14        Yet Creager admits that he received between $187,500 and $212,500 in salary and bonus

15   for his six to seven months of work with Mr. Yoshimoto (Creager Dep. at 38:4 41:18) and that he

16   was fully reimbursed all expenses, including travel expenses, from AMG's start-up funds.

17   (Creager Dep. at 53:7-63:7.) This included an undocumented "expense reimbursement" check of

18   $50,000 that he wrote to himself as AMG ran short of funds. (*Id.*) reager also admits Yoshimoto

19   paid AMG's expense overrun. (Creager Dep. at 206:14-17.) As for "opportunity costs,"

20   Creager's resume (Ex. 41 to Creager Dep.) shows he operated a company named All-Trades.net

21   between April 2003 and May 2004, when "the company was sold to Nexa"; and Creager testified

---

23   [11] Further, as to defendant MPT, Creager's testimony that he did not enter the MOU with MPT (see above) eliminates
24   his fraud claim against MPT to the extent it is based on the same supposed assurances as the MOU. Creager also
     alleges that MPT's Nakazumi said AMG "would be taken care of" and would "continue to receive funding." Creager
25   could not have relied on these statements because they were not made to him and were made in late September 2004,
     after Creager already set to work with Yoshimoto. They are contained in a memo Mika Saitoh wrote, dated
26   September 28, 2005. (Ex. 132 and Saitoh Dep. at 209:5-210:22.) Further, they are taken out of context, a 90-minute
     discussion between Nakazumi and Saitoh in which Nakazumi said, among other things, that "AMG is not
     representing MPT"; and "Mr. Y and Bob have been running blind – without having established a relationship." *Id.*
27   Moreover, Creager admits Yoshimoto never told him MPT would provide further financing for AMG, and said there
     was no point in time when he was waiting for MPT's board to make a decision regarding AMG. (Creager Dep. at
28   192:3-10.)

he has been unemployed since leaving AMG (Creager Dep. at 40:21-43:7).  There is no apparent opportunity that Creager passed up; certainly no opportunity that would have paid him in excess of the amounts he received working with Yoshimoto.

In short, Creager has no provable consequential damages.  Thus, even if he could prove the other essential elements of fraud, his fraud cause of action still should be dismissed as a matter of law.

**D.     Creager's Sixth Cause of Action for Common Counts Fails Because He Does Not Seek a Certain Sum of Money**

**1.     Creager's alleged damages are not specific.**

Common counts are a "simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness." *McBride v. Boughton*, 123 Cal. App. 4th 379, 394 (2004).  The essential allegations of a common count are "(1) the statement of indebtedness in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment." 4 Witkin, Cal. Proc. (4th ed. 1997) Pleading, § 518 at 609; *see also Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 460 (1997).

Creager does not seek to recover indebtedness "in a certain sum." His complaint does not even provide an estimate of the amount of money he claims, but rather damages "according to proof." *See* Complaint, 17:8-16.  His cause of action alleging common counts should be dismissed.

**2.     Further, common counts are improper where the defendant's obligation is something other than the payment of money.**

Creager claims that under the MOU, he is entitled to three percent of the stock of several companies, and a ten-year option to buy an additional two percent of their stock at the price per share at the time of MPT's acquisition.  Complaint at ¶ 3.  Where the defendant's obligation under an alleged contract is something other than the payment of money, it is insufficient to plead common counts.  4 Witkin, Cal. Proc. (4th ed. 1997) § 516 at 607; *O'Connor v. Dingley*, 26 Cal. 11, 22 (1864).

3.    **Moreover, Creager's common count claim must fail if his breach of contract claim fails.**

Creager's first cause of action alleges breach of contract based on specific factual allegations. The sixth cause of action for common counts seeks the same recovery, based on the same facts. *See* Complaint, ¶ 72 ("Defendants are indebted to Plaintiff for the monies that they have retained in violation of Plaintiff's written agreement with Defendant Yoshimoto"). If any defendant prevails on the breach of contract claim, the common count claim must also be dismissed:

> It is the established law of California that, if plaintiff is not entitled to recover under one count in a complaint wherein all the facts upon which his demand is based are specifically pleaded, it is proper to sustain a demurrer to a common count set forth in the complaint, the recovery under which is obviously based on the same set of facts specifically pleaded in the other count.

*Hays v. Temple*, 23 Cal. App. 2d 690, 695 (1937); *see also* 4 Witkin, Cal. Proc. (4th ed. 1997) Pleading, § 529 at 616.

**E.    This Court Lacks Personal Jurisdiction Over MPT**

It is the plaintiff's burden to prove that the forum state's long-arm statute confers personal jurisdiction over a nonresident defendant and that this exercise of jurisdiction comports with federal due process. *American Telegraph & Telephone Co. v. Companie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996); *Gray & Co. v. Firstenberg Machinery Co., Inc.*, 913 F.2d 758, 760 (9th Cir. 1990). Creager cannot meet his burden of demonstrating, by a preponderance of the evidence, that this Court has jurisdiction over MPT.[12]

As there is no federal statute governing personal jurisdiction in this matter, the Court must look to the state personal jurisdiction statute. *Hunt v. Erie Ins. Group*, 728 F.2d 1244, 1246 (9th Cir. 1984) (citation omitted). California's long-arm statute extends jurisdiction to the limits of

---

[12] The quantum of proof required to satisfy plaintiff's burden depends on how the Court determines whether personal jurisdiction lies. If the Court decides the jurisdiction issue based on written submissions, the plaintiff must only make a prima facie showing that jurisdiction is proper. *Omeluk v. Langsten Slip & Batbyggeri*, 52 F.3d 267, 268 (9th Cir. 1995). If the Court holds an evidentiary hearing, the plaintiff must "establish the jurisdictional facts by a preponderance of the evidence, just as he would have to do at trial." *Data Disc, Inc. v. Systems Technology Assoc's, Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1997).

1   due process incorporated in the federal Constitution.  Cal. Code of Civ. Pro. § 410.10; *Mattel, Inc.*

2   *v. Greiner and Housser GmbH,* 354 F.3d 857, 863 (9th Cir. 2003).  Constitutional due process is

3   satisfied when a nonresident defendant has "certain minimum contacts with the forum such that

4   the maintenance of the suit does not offend traditional notions of fair play and substantial justice."

5   *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945).  Where a nonresident

6   defendant purposefully avails himself of the benefits of conducting significant activities within

7   the forum state, it is presumptively reasonable to require that he "submit to the burdens of

8   litigation in that forum" when the lawsuit arises out of or relates to those forum-related activities.

9   *Burger King v. Rudzewicz*, 471 U.S. 462, 475-76 (1985).  Under this "minimum contacts"

10  framework, a federal court may obtain either general or specific jurisdiction over the defendant.

11  *Ziegler v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995).

12          **1.      MPT does not have the necessary continuous contacts with California
                       to support general jurisdiction.**
13

14          If the defendant has continuous and systematic general business contacts that approximate

15  a physical presence in the forum state, a federal court may exercise general jurisdiction, and the

16  defendant may be subject to suit even on matters that do not arise out of or relate to his activities

17  in the forum.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004),

18  citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 (1984) and *Bankroft &*

19  *Masters, Inc. v. Augusta National, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2004).  "This is an exacting

20  standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled

21  into court in the forum state to answer for any of its activities anywhere in the world."

22  Schwarzenegger, 374 F.3d at 801.  Mere purchase of goods and/or services in the forum state,

23  even on a regular basis, is not enough, nor is it sufficient that a defendant works with other

24  businesses or individuals based in the forum.  *Id.*  The ownership of a subsidiary located in the

25  forum does not suffice for personal jurisdiction.  *American Tel. & Tel. Co., supra,* 94 F.3d at 590.

26          In determining whether a defendant corporation has "continuous and systematic" business

27  contacts with the forum state, courts consider a variety of factors such as whether the company

28  maintains an office in the forum state, has employees in the forum state, uses bank accounts in the

1  forum state, or markets or sells products in the forum state.  *See, e.g., Helicopteros Nacionales,*

2  *supra,* 466 U.S. at 414-415, discussing *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S.

3  437 (1952).

4       Here, the evidence will show MPT does not "approximate a physical presence" in

5  California.  MPT is not incorporated in, or qualified to do business in California.  See Dec. of

6  Masuo Yoshimoto filed in support of Motion to Dismiss, ¶ 4.  MPT does not have a bank account

7  or other assets in California.  *Id.*, ¶ 8.  MPT has no employees in California, and MPT does not

8  market its services to California residents.  *Id.*, ¶¶ 6, 9.  Plaintiff cannot evidence facts that justify

9  the exercise of general jurisdiction.

10          **2.**       **The exercise of specific jurisdiction over MPT is not warranted by the**

11                    **facts of this case.**

12       Where general jurisdiction is lacking, a court may exercise specific jurisdiction over a

13  nonresident defendant if the suit arises out of or relates to his activities in the forum.  The Ninth

14  Circuit has established a three-part test that incorporates the Supreme Court's analysis in *Burger*

15  *King, supra.  See Data Disc v. System Technology, supra*, 557 F.2d 1280, 1287 (9th Cir. 1997));

16  *Schwarzenegger*, 374 F.3d at 802.   First, the nonresident defendant must do some act or

17  consummate some transaction with the forum by which he purposefully avails himself of the

18  privilege of conducting activities in the forum, thereby invoking the benefits and protections of its

19  laws; second, the claim must arise out of or result from the defendant's forum-related activities;

20  and third, the exercise of jurisdiction must be reasonable.  *Data Disc*, 557 F.2d at 1287.

21  Purposeful availment requires something more than the mere foreseeability of a defendant being

22  haled into court in the forum state.  *Pacific Atlantic Trading Co., Inc. v. M/V Main Express*, 758

23  F.3d 1325, 1329 (9th Cir. 1985).  Likewise, a defendant may have some degree of actual contact

24  with the forum without receiving the benefit required.  *Burger King*, 471 U.S. at 475.  Mere

25  contact with the forum is not enough.  *U.S. Vestor, LLC v. Biodata Information Technology AC*,

26  290 F.Supp.2d 1057, 1063 (N.D.Cal. 2003).

27       While plaintiff makes conclusory allegations that MPT has sufficient contacts with

28  California (Complaint, ¶ 8), plaintiff cannot prove facts suggesting MPT has done any act or

1  consummated any transaction within California, with respect to this dispute.

2      Nor can plaintiff meet the third requirement that exercise of jurisdiction be reasonable.  In

3  determining whether the exercise of jurisdiction over a nonresident defendant is reasonable, the

4  Ninth Circuit has outlined seven non-exclusive factors:

5      1)    the extent of the defendants' purposeful interjection into the forum state's affairs;

6      2)    the burden on the defendant of defending in the forum;

7      3)    the extent of conflict with the sovereignty of the defendants' state;

8      4)    the forum state's interest in adjudicating the dispute;

9      5)    the most efficient judicial resolution of the controversy;

10     6)    the importance of the forum to the plaintiff's interest in convenient and effective

11  relief; and

12     7)    the existence of an alternative forum.

13  *Roth v. Garcia Marquez*, 942 F.2d 617, 623 (9th Cir. 1991); *Core-Vent Corp. v. Nobel*

14  *Industries AB*, 11 F.3d 1482, 1487 (9th Cir. 1993).  No single factor is dispositive.  The court

15  should balance all of them, and some may be more significant than others in context.  Core-Vent

16  at 1487-88.

17     Here, none of the seven "reasonable" factors supports jurisdiction over MPT.  These

18  factors are similar to factors governing MPT's forum non conveniens argument, discussed in

19  greater depth below.  Briefly, MPT has not interjected itself into California's affairs; the burden

20  on MPT of defending in California is substantial and unnecessary; Japan has a greater interest in

21  adjudicating this dispute than this Court; the most efficient judicial resolution of this controversy

22  is in Tokyo District Court, where defendants Yoshimoto and M2M have sued plaintiff Creager;

23  the only importance of this forum to Creager is that he lives in San Francisco; and the courts of

24  Japan provide a reasonable alternative forum.

25          **3.    Yoshimoto's relevant acts cannot be imputed to MPT.**

26     Plaintiff's argument that Yoshimoto is an agent of MPT is overly simplistic.  Obviously,

27  Yoshimoto may act for MPT as its CEO and Chairman of the Board.  However, many of

28  Yoshimoto's actions with respect to Creager do not qualify as actions of MPT.  The evidence

shows that Mr. Yoshimoto wore several hats, at times pursuing his own interests, at other times

acting on behalf of M2M.  Plaintiff's own evidence bears this out.  In Exhibit O to a declaration

of Mika Saitoh on file herein, Ms. Saitoh wrote to Mr. Yoshimoto, "You trusted us with your

personal money and we want to be responsible."  Similarly, in Exhibit B to Mr. Creager's

declaration on file herein, Mr. Yoshimoto wrote to Creager:

> Frankly saying, during coverage your expense (most of people said
> very high costs) by AMG, it was fine because only suffer to me, but
> now if you join MPT group as NOT consulting basis, it is really
> difficult to accept your suggested price of cost before any real sales
> results happen.

The MOU itself was between Creager and Yoshimoto, not MPT.  The MOU states:

"Masuo Yoshimoto and Robert Creager agree to work together to create a Delaware company to

be named 'AMG' ..."  The MOU memorialized the two men's intention "to create and capitalize

AMG with a cash injection of US $500K from M2M" (not MPT) and required, for instance,

Creager to reimburse Masuo Yoshimoto (not MPT) a $10,000 expense advance.  The signature

block for Mr. Yoshimoto contains only his name, with no reference to MPT or Mr. Yoshimoto's

position with MPT.  Creager has testified he did not consider Yoshimoto and MPT to be one and

the same, and that MPT was not a party to the MOU.  Many emails sent by Creager evidence

clearly that he worked with Yoshimoto individually and considered MPT a distinct entity, often at

odds with him.

Accordingly, it is not true that each of Mr. Yoshimoto's contacts with California may be

attributed to MPT through principles of agency.  His visits to California involving the operation

of AMG plainly were not performed as CEO of MPT.  The cases Creager has cited concerning

issues of agency are inapposite.[13]  Creager simply cannot rope MPT into this American setting

---

[13] *Ochoa v. J.B. Martin & Sons Farms, Inc.*, 287 F.3d 1182 (9th Cir. 2002) addressed whether a New York grower exercised sufficient control over an Arizona independent contractor which supplied the grower with seasonal migrant farm workers.  The court conducted an eight-part "independent contractor" analysis to resolve the question of control, finding there was sufficient control to exercise jurisdiction.  The court also cited Arizona's strong interest in preventing its citizens from being exploited by out-of-state employers.  Here, there is no question involving MPT's control over Yoshimoto, or vice-versa.  *Theo H. Davies & Co., Ltd. V. Republic of the Marshall Islands*, 174 F.3d 969 (9th Cir. 1999) held the Foreign Sovereign Immunities Act did not prevent exercise of jurisdiction over Marshall Island corporations which did "not contest being characterized as agencies, instrumentalities, and/or political subdivisions of" the Republic of the Marshall Islands.  *Id.* at 972.  *Myers v. Bennett Law Offices*, 238 F.3d 1068 (9th Cir. 2001) decided whether the actions of a paralegal could be attributed to a law firm, concluding the paralegal acted *(Footnote continued on next page)*

1    under the standards of "fair play and substantial justice" required by *Burger King.*

2    **4.    The Court must be especially careful in exercising jurisdiction over foreign corporations.**

3

4    Both the United States Supreme Court and the Ninth Circuit have made clear that, when

5    the nonresident defendant is a corporation from another country, the district court must be

6    especially careful in its exercise of personal jurisdiction. *Asahi Metal Industry Co. v. Superior*

7    *Court*, 480 U.S. 102, 115 (1987); *Core-Vent v. Nobel, supra*, 11 F.3d at 1488. In *Asahi*, the

8    question confronting the Supreme Court was whether a California state court may exercise

9    jurisdiction over a Taiwanese supplier in a tort action arising out of the sale of a component to a

10   Japanese manufacturer. Though the subject accident took place in California, the Court

11   determined there were insufficient contacts between the supplier and the forum, noting, "[T]he

12   unique burdens placed upon one who must defend oneself in a foreign legal system should have

13   significant weight in assessing the reasonableness of stretching the long arm of personal

14   jurisdiction over national borders." 480 U.S. at 114. *See also Pacific Atlantic Trading, supra,*

15   758 F.2d at 1330 ("The burden of nding in California appears considerable. The distance

16   between California and Malaysia is substantial, and potential witnesses to the execution of the

17   indemnity contract are most likely in Port Kelang.").

18   The Ninth Circuit has gone so far as to state that "litigation against an alien defendant

19   creates a higher jurisdictional barrier . . . because important sovereignty concerns exist." *Core-*

20   *Vent, supra*, 11 F.3d at 1489, quoting *Sinatra v. National Enquirer*, 854 F.2d 1191, 1199 (9th Cir.

21   1988). *Core-Vent* concerned libel and antitrust claims arising from articles published in

22   international medical journals. The court stated:

23       Requiring the [defendants] to submit to the jurisdiction of the court
          would impose substantial burdens on them and would interfere with

24

25   *(Footnote continued from previous page)*
     with apparent authority. *Id.* at 1073, fn. 2. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, PA*, 290 F.3d
26   42 (1st Cir. 2002) decided whether actions taken by two law firms that jointly hired a consultant could be imputed to
     one another for jurisdictional purposes. The court held the defendant law firm ratified the retention agreement
27   because the consultant worked thousands of hours for the firm over four years. Here, there is no evidence MPT
     "ratified" Yoshimoto's alleged agreement. Creager's declaration simply says MPT's Ryuzo Nakazumi came to
     California once, in furtherance of MPT's acquisition of LogicLink. This says nothing about the alleged agreement.

28

1   the sovereignty of a foreign nation.  The Supreme Court in Asahi
    indicated that a plaintiff seeking to hale a foreign citizen before a
2   court in the United States must meet a higher jurisdictional
    threshold than is required when the defendant is a United States
3   citizen.  Indeed, commentators have suggested that the international
    factors were determinative in Asahi.

4

5   11 F.3d at 1490.

6        This case raises similar concerns.  After hearing Creager's evidence, the Court should

7   decline to exercise jurisdiction over MPT.

8   Dated: February **26**    , 2008              SCHIFF HARDIN LLP

9

10                                              By: _____

11                                                  Robert B. Mullen
                                                    Attorneys for Defendants
                                                    M.P. TECHNOLOGIES, INC.
12

13  Dated: February _____, 2008                GEARINGER LAW GROUP

14

15                                              By: _____

16                                                  Brian Gearinger
                                                    Attorneys for Defendants and
17                                                  Counterclaimants
                                                    MASUO YOSHIMOTO and M2M, INC.

18  SF\9096361.1

19

20

21

22

23

24

25

26

27

28